THE ASHBOURNE.

THE BOUKER NO. 2.

(Circuit Court of Appeals, Second Circuit. June 14, 1910.)

Nos. 270, 271.

1. Collision (§ 66*)—Passing Tows—Fault.

In a libel against certain tugs for injuries 'to a scow due to a collision between the tows, evidence *held* to require a finding that the main fault was that of the tug of one of the tows in permitting her tow to get on the port side of the channel owing to negligent navigation.

[Ed. Note.—For other cases, see Collision, Cent. Dig. § 84; Dec. Dig. § 66.*]

2. Collision (§ 123*)—Primary Fault—Contributing Negligence.

In a libel for collision, the vessel guilty of primary fault is liable for the damages sustained, and clear proof of contributory fault by the other vessel must be presented before the latter can be held to bear an equal share of the damages.

[Ed. Note.—For other cases, see Collision, Cent. Dig. §§ 259–261; Dec. Dig. § 123.*]

Appeals from the District Court of the United States for the Southern District of New York.

Libel by the Red Star Towing & Transportation Company against The Steamtug Ashbourne and the Steamtug Bouker No. 2, and by the Phoenix Towing & Transportation Company against the same vessels. From a decree dismissing the libels as to the Ashbourne and assessing damages against the Bouker No. 2, she appeals. Affirmed.

The following is the opinion of Adams, District Judge, in the trial court:

This action was commenced by the Red Star Towing & Transportation Company, filing a libel against the tug Ashbourne, in which it is alleged that on the 11th day of October, 1907, at about 8 o'clock P. M. the tug Ashbourne started with a tow from Packer Dock, Jersey City, bound for Port Reading, New Jersey, the boat Red Star being in the fifth tier of the tow and next to the outer port boat; that the tow consisted of twenty-four boats, four boats abreast, making six tiers, the hawser or leading tier being fast to the stern of the Ashbourne. That the Ashbourne proceeded across the Bay of New York, and into the Kill von Kull with the tow, and when nearing or in the vicinity of Bergen Point, the steamtug Bouker No. 2, bound towards New York, was observed coming through the Kills with two mud scows in tandem fashion, in tow of and astern of the Bouker No. 2; that before meeting one another the said steamtugs exchanged a signal of one whistle, the tide running ebb at the time and the wind from the west, and that the tugs with their tows attempted to pass one another, the Bouker No. 2 being on the Staten Island side of the channel and the tug Ashbourne with her tow on her port side, but that in the effort to pass, the boat in the fourth tier of the Ashbourne's tow on the port side came in contact with the mud scow in tow of the Bouker No. 2 driving her back so as to bring her in contact with the boat Red Star, resulting in serious damage to her and in the sinking of the boat in the fourth tier of the Ashbourne's tow. That the collision occurred about 2:30 A. M. on the 12th day of October, 1907.

The faults alleged against the Ashbourne are: (1) in not keeping a proper lookout; (2) in not having a helper at the stern or somewhere on the port side of her tow in order to keep it straight and follow in the wake of the Ashbourne; (3) in not giving a wider berth to the Bouker No. 2 and her tow

*For other cases see same topic & § number in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

in passing, as there was plenty of room on her starboard side so to do; (4) in not blowing any alarm whistles; (5) in not taking timely measures to prevent her tow, because of the tide and the direction of the wind (the boats being light) from setting on to the tow of the Bouker No. 2. The damages claimed were $900; (6) in not stopping so as to prevent collision.

The Ashbourne's answer to the libel alleges that at 2:20 A. M. on the 12th of October, when between Bergen Point Ferry and the Red Buoy those in charge of the Ashbourne observed the loaded tow coming up in charge of the Bouker No. 2, consisting of two loaded mud scows; that signals of one whistle each were exchanged between the tugs, and that pursuant thereto the Ashbourne ported her wheel and stood over as much as she possibly could to the starboard side of the channel; that the Bouker No. 2 and her scows passed the tug Ashbourne, but that the Bouker No. 2 failed to keep to the starboard side of the channel, with the result that the first scow in her tow struck the Irene, that being the port boat in the fourth tier of the Ashbourne's tow, breaking her and six other boats adrift and causing serious damage to the said boats.

The allegations of fault against the Bouker No. 2 are: (1) that she did not keep over to the starboard side of the channel; (2) that she had no competent lookout or a competent man in charge of her navigation; (3) that her tow was improperly made up so as to be unmanageable; (4) that in having ample room to pass the Ashbourne and her tow, if properly managed, she brought her tow into collision with the tow of the Ashbourne.

The Ashbourne then filed a petition bringing the Bouker No. 2 into the action and alleged substantially the same facts and the same faults as stated in her answer.

Some little time after that the Phoenix Towing & Transportation Company filed a libel against the Bouker No. 2 and the Ashbourne. The last mentioned libelant was owner of the scow Irene, and the libel was joined by Chris Seiverson, the master of the Irene. The libel alleges that the Irene was placed in the third tier of boats and made fast in the tow by two hawsers from the bow to the stern of the boat ahead of her and two hawsers from its stern to the bow of the boat immediately astern of it; that when the tow was so made up, the Ashbourne started with it bound for Port Reading, and that while the tug and tow were under way and when about abreast of Bergen Point Buoy about 2 o'clock in the morning of the 12th of October, the tug Bouker No. 2 was observed approaching, bound towards New York, then being about opposite Shooter Island, the Bouker No. 2 having two loaded mud scows in tow astern, one behind the other; that both the Ashbourne and Bouker No. 2 had their tows on hawsers and that they proceeded on such a course that the head mud scow in tow of Bouker No. 2 struck the Irene breaking in the planks in her side and stern and affecting other severe damage, whereby some of the hawsers with which it was made fast were broken and she sustained damages, including damage to the master's household furniture, and so forth. The damages in this case caused by the sinking of the boat are claimed to be $2,300 and the loss of the master's personal effects $350.

The allegations of fault against the Ashbourne are: (1) in endeavoring to navigate with a tow that was too large and unwieldy to permit of proper navigation; (2) in making up its tow in a careless manner; (3) in failing to keep nearer to the New Jersey shore; (4) in navigating on such a course as to bring its tow into collision with the tow of the Bouker No. 2; (5) in failing to observe the approach of the Bouker No. 2 with its tow in time to take measures necessary to avoid collision; (6) in approaching on a course too close to the No. 2 and its tow; (7) in neglecting to provide for sufficient assistance or help in the navigation of a fleet of the size of that which the Ashbourne had in tow.

The Bouker No. 2 is charged with fault: (1) in failing to keep over towards the Staten Island shore; (2) in failing to have her tow upon a hawser of such length that she would be able to properly control her tow and avoid collision; (3) in proceeding on a course too close to the Ashbourne; (4) in failing to observe the course of the Ashbourne and her tow in time to avoid collision.

This libel was duly answered by both parties and I do not think it necessary to state the pleadings any further at this time.

The pivotal point of this collision is which boat was on the wrong side of the channel. It is claimed on the part of the Ashbourne that the tow of the No. 2 swung out from her side of the channel and got in the Ashbourne's water so that the collision happened, the Ashbourne claiming that her tow was kept straight behind her and always on her own side of the channel.

The most difficult question in this case is to determine which tug dragged her tow out of its own water. The tide was ebb. There has been some little dispute about its strength, it being contended on the part of some that it was as much as four or five knots, while on the other hand it is contended that it was practically a knot and a half. There is great divergence there and it is not explainable in any way excepting perhaps the observations made by the government were not in the place at or near where the collision occurred. That has been suggested in the course of the argument. However, I do not see that that is controlling. The tide was undoubtedly ebb and running towards New York Bay; the Ashbourne was proceeding against the tide and the No. 2 was proceeding with it. Each had her tow behind her until one was in the immediate vicinity of the place of the collision, as to which the testimony does not differ very much, it being to the southward and a little to the westward of the Red Buoy in the channel opposite Port Richmond.

An important question in the case is what effect did the tide have upon the vessels? The tide being ebb, if there had been nothing to deflect it or change it in any way it would undoubtedly proceed nearly straight, somewhat influenced by the contour of the land, towards New York Bay; but there was a great volume of water coming out of Newark Bay, the principal part of it in the main ship channel and some small part over the shore between the Light and Bergen Point, and that part between the Point and the Light was, admittedly by all parties, much less in force than that which was running in the main ship channel. It is contended here by the Bouker No. 2 that that had a very considerable force, while on the part of the Ashbourne it is alleged that it had very little force. I think the preponderance of the testimony shows that it did have some force although it was close up to the Light, between the Light and the Point, but it was a narrow channel at best, that is, the part of the channel which allowed the flow of any considerable body of water; most of it was broken up by the rocks which were on the bottom and it was only up near the Light there could be a channel allowing any force at all, so that I do not think that the force of the water to the eastward of the Light had very much to do with this collision. Of course the great body of the water came out of the regular channel to the westward of the Light and then meeting the regular tide or the currents running to the eastward joined with it and ran over and struck the Staten Island shore in the vicinity of what is known as the Fighting Dock. Whatever the strength of the tide may have been—anywhere from two to four knots probably—when it struck the Staten Island shore at the point indicated, it then struck over across the channel and proceeded in the direction of the New Jersey shore to a point a little to the eastward of what is known as the Bergen Point Ferry. Now, when the Ashbourne brought her tow down in the vicinity of the Red Buoy she then encountered this Newark Bay tide, and there has been a great controversy as to what the influence of that tide was upon the Ashbourne's tow; it being contended by the Ashbourne that it simply had the effect of keeping the tow out straight behind her on her starboard side of the channel; and on the part of the No. 2 it has been contended that some portion of the tide struck across, caught the Ashbourne's tow and forced it over to the No. 2's part of the channel. Giving to this the best consideration I can, I have come to the conclusion that the Ashbourne's contention is right. At the opening of the case when the claims of each side were given I was quite inclined to think that the case would turn against the Ashbourne because she was taking a large tow—twenty-four boats—to the westward—and if there were any tide at all it would tend to deflect her tow from a straight course, it would naturally affect it very much, and I thought she should have a helper properly stationed so as to aid her. She had a helper but the helper was up on the first tier where, while it was useful no doubt as far as speed was concerned, it was of no use whatever in keeping her tow straight. I think that is conceded by proctor for the Ashbourne. It is claimed that she did not need any helper at

181 F.—52

the end of the tow because it would have to be straight on account of the way the current was running and as I said a moment ago, I think most likely that is the situation and that she could not get her tow over on the Staten Island side of the channel, which was 600 or 700 feet wide probably, unless there was something more than the current to take her there. I believe that this collision which occurred between the tows of the respective tugs was on the northern side of the mid channel. To account for No. 2's tow being there, the Ashbourne suggests that it was an unmanageable sort of tow, difficult to tow straight, and that when it got a cant in either direction it was very difficult if not impossible to straighten it out immediately, therefore, while the No. 2 went by the Ashbourne's tow safely, the scows sheered over in a somewhat northerly direction and struck the tow of the Ashbourne in the fourth tier; there were six tiers altogether, and the other tiers cut loose from the rest of the tow and perhaps avoided it in that way.

I think the main fault in this case was that the No. 2 permitted her tow to get on her port side of the channel, the Ashbourne keeping her tow in a reasonably straight line on her starboard side of the channel, so that if the No. 2 had kept her tow on her side of the channel the collision would have been avoided.

It only remains to consider whether, or not, there was any contributing fault on the part of the Ashbourne. It has been argued that she should have stopped; that she should have blown alarm whistles. After listening very attentively to what has been said in that connection by the proctors, while granting that she was undoubtedly in fault in those respects, because she should have had a lookout and should have blown alarm whistles, still I am not convinced that her faults in those respects really contributed to the collision.

There has been a strong disposition manifested on the part of the courts recently to let the blame rest where it principally belongs. Some time ago I had a case that occurred in the channel between Blackwells Island and the New York shore, where the tug Teaser with a tow on a hawser was going to the southward and eastward and met a tug with a tow of two car-floats, I think, one on each side of her in the channel. The Teaser was proceeding to the westward and the other tug to the eastward and was on the wrong side of the channel. I divided damages there. I held the Teaser in fault also because she did not stop or do something to avoid the collision. My decision was reversed by the Circuit Court of Appeals which said: "The Teaser was held to have fulfilled her duty in porting, in going to the right of the channel and as to her lights and signals. The testimony of her witnesses as to her navigation was credited by the district judge who heard them, and we see no reason why it should be discredited. She saw No. 14 and her floats when nearly a mile away. She repeatedly blew single whistles, interspersed with alarm whistles when they were not responded to either by whistles or by change of course. She ported promptly, then straightened out, then ported again, and finally when quite as close to the New York shore as it was safe to go. She was condemned for not stopping and backing sooner. In the City of Augusta and the Chicago, 125 Fed. 712, 60 C. C. A. 480, we held that, where a primary fault was attributable to one vessel, clear proof of contributing negligence by the other vessel should be presented, before the latter could be held to bear an equal share of the consequent damage."

This case seems to me even more doubtful than that of the Teaser. It seemed to me then that the Teaser should have stopped because she was almost running into collision and I thought if she had stopped to give the other vessel a chance it would have done something towards avoiding a collision. Bnt you see what the Circuit Court of Appeals has held, and applying the principle to this case the collision can be accounted for by the fault of No. 2, if I am correct in holding her in fault.

I therefore allow a decree in favor of the libelants against the Bouker No. 2 and dismiss the libels as to the Ashbourne.

Counsel for the tug Bouker No. 2 offer in evidence the report of the captain to the local inspectors. It reads as follows:

"Tugboat Bouker No. 2 at 12:30 A. M. the 12th instant left Dredge No. 7 off Crassell, S. I., with two mud scows 7 R R and 14 H on a short hawser bound

to sea. About 2:30 A. M. I was at the east of Shooters Island when I saw the lights of a west bound tow; he blew me one whistle which I promptly answered, as the tide was running ebb and the wind from the westward; I had to hold my tow well up to the windward as the tide out of Newark Bay sets strong on the Staten Island shore. I passed the tow which proved later to be the tug Ashbourne bound to Port Reading, I passed her on my port side about 300 feet, when I was abreast of the Fighting Dock, abreast of Newark Bay.

"My tow was close to the Staten Island shore and as my scows were drawing 14 feet I did not have much room; the light tow was sagging towards me, when my scows were about the middle of the light tow; the tow fouled my head scow No. 7 R. R. and the scow Irene was sunk; my hawser parted after the collision; the tow broke up and I went back and beached the scow Irene at West Brighton. The man on the scow got on a canal boat in the tow. I could not learn of any other damage done so I proceeded to sea; the lights on my scows were burning brightly.

"I did everything in my power to avoid a collision and I had a strong ebb tide with me.

"Respectfully,           William J. Walsh."

Henry E. Mattison and Carpenter & Park, for appellant.

Armstrong, Brown & Boland, for appellee.

Before LACOMBE, COXE, and NOYES, Circuit Judges.

PER CURIAM. The crucial question in the case is where the collision occurred. If it was near the Oil Dock or Fighting Dock on the Staten Island side of the channel it would be easy to find the Ashbourne in fault. If, however, it happened on the other side of the channel near the red buoy, the Bouker No. 2 would seem to be in fault. The District Judge found that the collision was on the northern side of the channel a little to the westward of the red buoy. The testimony as to location is voluminous and very conflicting; all the witnesses who gave evidence on that point were examined in court, and the District Judge had the advantage of seeing them and hearing their testimony. We find nothing in the case which would warrant this court in reversing his finding. The decrees are affirmed, with interest to libelants, and with costs to the Ashbourne against the Bouker No. 2.