## THE MASCOT. THE EMMA K. REED. UNITED STATES SHIPPING BOARD EMERGENCY FLEET CORPORATION v. HEDDEN et al.

(Circuit Court of Appeals, Third Circuit. August 29, 1922.)

No. 2828.

1. **Collision ⬤⟿136—Damages paid for detention.**
    For an injury to a boat in a collision, all the damages suffered, including those for detention of vessel during time necessary to make repairs and fit the vessel to resume her work, should be paid by the party at fault, if the value of the offending boat and the pending freight for the voyage is sufficient to do so, under Rev. St. § 4283 (Comp. St. § 8021).

2. **Collision ⬤⟿123—Libelant, claiming damages for labor of extra crew necessitated by leaking of vessel, had burden of proving necessity thereof.**
    In libel for damages caused by collision, the libelant, to recover for the labor of an extra crew who handled the freight, on the ground that the leaking of the vessel required the old crew to operate the pump, was required to prove that the services of the entire new crew to handle the lumber was made necessary by using the entire old crew for pumping.

3. **Collision ⬤⟿125—Evidence held insufficient to prove necessity of new crew, for which libelant claimed damages.**
    In libel for damages caused by collision, in which libelants sought to recover for labor of extra crew made necessary by leaking of vessel, requiring old crew for pumping, evidence *held* insufficient to prove necessity of entire new crew.

4. **Collision ⬤⟿125—Evidence held not to sustain libelants' claim for demurrage detention.**
    In libel for damages caused by collision, evidence *held* insufficient to sustain libelants' claim for demurrage detention.

5. **Collision ⬤⟿125—Evidence held to prove repairs due to age and use of boat, and not to collision.**
    In libel for damages caused by a collision, evidence *held* to show that some of the repairs for which libelant claimed damages were due not to collision, but to age and use of the boat.

6. **Damages ⬤⟿62(1)—Injured party required to use diligence to reduce damages.**
    In an accident or breach of contract, it is the duty of the injured party to use due diligence to reduce, and not increase, the damages to be paid by the party in fault.

Appeal from the District Court of the United States for the Eastern District of Pennsylvania; Oliver B. Dickinson, Judge.

⬤⟿For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Libel by E. J. Hedden and H. K. Paxson, owners of the boat Emma K. Reed, against the United States Shipping Board Emergency Fleet Corporation, owner of the tug Mascot. Decree for libelants, and respondent appeals. Decree modified.

George W. Coles, U. S. Atty., and Joseph L. Kun, Sp. Asst. U. S. Atty., both of Philadelphia, Pa., for appellant.

Willard M. Harris, of Philadelphia, Pa., for appellees.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

DAVIS, Circuit Judge. This is an appeal from a decree of the District Court allowing a claim of $1,500 against the United States Shipping Board Emergency Fleet Corporation, owner of the tug Mascot, which rammed the Emma K. Reed, hereinafter called the Reed, while lying at Hog Island. The libelant claimed damages of $6,291.37, made up as follows:

| | |
|---|---|
| Repairs | $ 465.30 |
| Demurrage, detention of 48 days, at $100 per day | 4,800.00 |
| Expense for extra labor in pumping out the boat while performing government contract | 1,026.07 |
| Total | $6,291.37 |

The commissioner to whom the case was referred allowed the first and third items as claimed, but modified the second, by reducing the days to 42 and deducting $12.51, the daily cost of fuel, from each day, so that this item was reduced to $3,674.58, and his total allowance for the original damage of $465.30 was $5,165.95. Exceptions were entered to these findings, which were sustained by the learned trial judge. "to the extent of reducing award of damages to $1,500, with costs, in favor of the libelant. The exact ground on which this award was made is not clear. A number of items were eliminated, and, after stating that the basis for finding damages did not clearly appear in the record, but that an award could be made under the evidence, and that there was no need of prolonging the long and expensive litigation, the judge of the District Court said:

"We end it now, so far as concerns this court, by sustaining the exceptions to the extent of reducing the award of damages to $1,500, and entering judgment for that sum, with costs, in favor of the libelant and against the respondent, by authorizing a formal decree to be entered that the respondent pay this sum to the libelant, with costs. In estimating the damages at even this sum, we feel that we have fallen in with the old sentiment, which still lingers, that any catastrophe which befalls a vessel is a deodand, a veritable gift to the gods, to any one who can get anything out of the event, and that, if payment is made by government, the blessing should be doubled."

[1] It may be impossible to make, or even approximate, a mathematically exact award; but this is due to confused and inexact testimony. For an injury to a boat in a collision, all the damages suffered should be paid by the party at fault, if the value of the offending boat and the pending freight for the voyage are sufficient to do so. Section 4283, Revised Statutes of the United States (Comp. St. § 8021); Norwich Co. v. Wright, 80 U. S. (13 Wall.) 104, 120, 20 L. Ed. 585; Benedict's Admiralty (4th Ed.) §§ 521, 543, 544. The wrongful act and the

measure of the indemnity are not limited by contract, but are coextensive with the damages, including damages for detention of the vessel during the time necessary to make repairs and fit the vessel to resume her work. " 'Restitutio in integrum' is the leading maxim in such cases." Williamson et al. v. Barrett, 54 U. S. (13 How.) 101, 110, 14 L. Ed. 68; The Baltimore, 75 U. S. (8 Wall.) 377, 385, 19 L. Ed. 463; The Conqueror, 166 U. S. 110, 125, 17 Sup. Ct. 510, 41 L. Ed. 937. While the libelant did not appeal, it is seeking to justify and sustain the allowance made by the commissioner, with a modification of the detention claim. These allowances will be considered in their reverse order.

The first one is the claim of $1,026.07 for the labor of an extra crew alleged to have been necessitated by the leaking of the Reed. The old crew, it is averred, operated the pump, while the new crew handled the lumber. It should be observed that, while the accident occurred July 16, 1918, the Reed continued its regular and daily work throughout the season until that contract with the government was completed. Libelant then made another contract, on which the Reed worked 7 or 8 days at $100 per day, and no claim whatever was made for damages for the collision, nor negotiation entered into relating to it, until May 23, 1919. In the libel, filed 3 months later, no claim was made for the labor of a new crew. This claim was first intimated at one of the hearings before the commissioner, the first of which began December 30, 1920, and an amended libel was thereafter filed on January 19, 1921, which contained the formal claim. Although the leaking is alleged to have begun at once after the accident, on July 16, 1918, the log does not contain even a hint that the boat leaked until October 9, 1918, sometime after she had been struck on the starboard side in another collision. Since leaking is mentioned once in the Reed's log—"Started to load Oct. 9 for St. George; leaking"—it is not unreasonable to infer that there would have been some mention of leaking caused by this collision in the log, if she had been leaking so badly as to require an extra crew to keep her pumped out.

Further, it does not appear how many persons composed the new crew. There were seven on the boat composing the old crew, which, after the accident, according to the libelant, did not handle any lumber but operated the pump. It appears that only one man at a time worked at the pump, which was not continuously operated, and what the others did while he was pumping is not disclosed. Just when this new crew began to work is not clear. The amount of $1,026.07 is reached by multiplying 610,758 feet of lumber, all the Reed is alleged to have carried for the government on that contract after the accident, by $1.68 per 1,000 feet. Exactly how many feet were actually carried, however, after the accident, is not definitely known. Mr. Harold K. Paxson, half owner of the Reed, said:

"I have figures [which he did not produce] showing the number of feet the boat carried after that on the Hog Island contract was 600,000 feet."

The extra cost per 1,000 feet for transportation does not seem to have been definitely determined. Mr. Paxson testified that the "average cost for handling lumber was $2, $2.17, or $2.70," while the claim

in the libel, adopted by the commissioner, is based on a cost of $1.68 per 1,000. How libelant worked out the basis of $1.68, different from any one of the three average costs, is not disclosed.

[2, 3] The burden is on the libelant to establish that the services of an entire new crew to handle the lumber was made necessary by using the entire old crew for pumping, and this burden has not been sustained to our satisfaction. The claim is clothed with such doubt and is so indefinite that it must be disallowed.

The libelant now claims as demurrage detention, not 48 days, claimed in the libel, nor 42 days, allowed by the commissioner, but 25 days, from October 18 to November 13, 1918, 27 days, less October 18th and 19th, paid for by the government, at $100 per day, with an allowance to the Fleet Corporation of $12.50 per day for fuel which was not consumed, or a total of $2,187.50. After the Reed had finished her contract of carrying lumber from Bristol to Hog Island, another one was made for carrying lumber from Bristol, Pa., to St. Georges, Del. Mr. Paxson testified that he had lost the contract, but offered a letter from libelant to the government, containing the terms of it and a voucher, by means of which he seeks to establish the contract for $100 per day for the Reed. The first trip in performance of this contract was made on October 10th. The copy of the letter was dated October 23, 1918, five days after the Reed had been taken to Baltimore for repairs, and the voucher was dated October 31st. The contract, according to the letter, was for the services of a "boat having the capacity of 100,000 feet, board measure." The voucher shows that on this first trip, consuming four days, the Reed carried "approximately 65,000' B. M." She made one more trip, and then went to Baltimore.

[4] This claim is based upon the assumption that the Reed, carrying, not 65,000, but 100,000 feet, would have worked under the contract at that price for 27 days, until November 13th. The contract, however, was not for any specified time, and libelant does not know how long its boat would have been used, nor how long the other two boats alleged to have been carrying lumber from Bristol to St. Georges at that time continued after October 18th, when the Reed quit the job. Nor is it disclosed how much lumber was to be carried from Bristol to St. Georges. With this indefiniteness, and with such improbability, that it amounts to a certainty, that all the injury complained of and repairs made were caused by the Mascot, we cannot say that the libelant has borne the burden of proving that the detention claim, or what part, if any, should be allowed, and therefore it will be disallowed.

It is next to impossible to determine with accuracy what part of the repair bill of $465.30 was due to the Mascot. The Reed seems to have been in two other collisions after she was rammed by the Mascot and before she was taken to Baltimore. Capt. Riggin testified about a collision of the Reed with a tug or barge, in which damage was done to her on the "starboard side." The log records a collision of the Reed on August 5, 1918, as follows:

"Left Philadelphia 11:15 a. m. with a party for Hog Is., and return to Phila. 2:30 p. m. Left pier 2:45, struck on starboard side by ferryboat (6)."

282 F.—49

Whether or not the testimony of Capt. Riggin refers to the collision with the ferry boat is not entirely clear. His language, which is not exact, may indicate another collision than that with the "ferryboat." He refers to "collisions," and "tug," and "barge," and "striking it on the stem, coming down on the stem, the lines, coming back, pulled the bitts off. They was rotten; they was worse than I thought they were, and they pulled off even with the deck." This language does not seem descriptive of the collision with the "ferryboat," which "struck [the Reed] on the starboard side." If this collision, however, is that referred to in the log, there was only one other than that with the Mascot.

[5] The repair work done by the Chesapeake Marine Railway was on the starboard side, while the Mascot struck the Reed "amidships, on the port side, just opposite the engine room door." Middleton B. Luber, the assistant superintendent of the Chesapeake Marine Railway, under whose supervision the work was done, doubtless knows more about the repairs than any one else; but his testimony is confusing. At one place he testified that only the caulking was due to the accident at Hog Island, and that cost only about $26. Again, he said some of the planks were cut out under her stern, because they were defective. The testimony shows that some of the repairs were due, not to a collision, but to age and use of the boat. One of the bills for repairs alleged to have been due to the Mascot was for $113.56. Under cross-examination of libelant's counsel, Mr. Luber testified as follows:

"Q. So this $113.56, less the caulking, amounting to $14, is chargeable to other work other than the collision (with the Mascot)? A. Yes, sir.

"Q. And the remainder, the difference between our $465.30 and $113.56, less $14, should be charged against the Mascot. Is that correct? A. To the best of my knowledge and judgment.

"Q. You understand what I mean? In other words, $113.56, less $14, is chargeable against another collision? A. Yes, sir.

"Q. And the difference between that and the $465.30 is directly chargeable against the Mascot? A. Yes, sir."

Put into mathematical formula, this results as follows: $465.30— ($113.56—$14.00) = $365.74. Of all the reliable testimony, this is the most favorable to libelant. Still further under cross-examination Mr. Luber testified:

"Q. The testimony in this case says that this particular collision damaged the Emma K. Reed on her port quarter? A. Yes.

"Q. And you have testified that repairs were on her starboard, the bitts; so, apparently, the one we are covering has slipped your recollection? A. I know it hasn't been done; I can't recollect doing it.

"Q. You do not remember repairing the port side, about opposite her engine room door; the engine being about astern? A. No, sir.

"Q. You do not recollect that? A. No, sir; we didn't repair it.

"Q. But you do say that the items, which you have marked here, were repairs made as a result of the collision which you heard was due to the Mascot running into this barge? A. No; I said there was caulking on that that was due to the damage that the Mascot done. The other we had taken out, the Mascot—the Mascot happened on the port side amidships. We repaired on the starboard side.

"Q. Did you make any repairs on the port side? A. No, sir; none whatever.

"Q. Do you remember a broken stanchion? A. Yes, sir; I looked at it last Saturday.

"Q. On the Emma K. Reed? A. Yes, sir.

"Q. Was it not repaired? A. No.

"Q. You did make some repairs to the Emma K. Reed which had been caused by the Mascot? Do you remember that? A. Only the caulking, only the bottom of the boat, that was shaken from the jar from the Mascot hitting it, opening the seam. The captain claimed that it opened the seams, and she started to leak. That is all the work, and the hauling which was necessitated by the collision.

"Q. Did you put in any new lumber? A. Yes.

"Q. On that part? A. Yes.

"Q. Caused by the collision? A. No.

"Q. Where did you put the lumber in? A. Under the stern.

"Q. What part? A. Right aft of the rudder.

"Q. Right under the tuck? A. No; I wouldn't call it the tuck. It goes right under the stern of the boat, in the hull.

"Q. You say that there was rotten wood in there? A. Some defective wood in there.

"Q. You say that you did not put in any new wood at all on the port side amidships, as the result of this collision? A. No, sir."

It would seem from this testimony that the only repairs made as a result of the collision with the Mascot was the caulking, $14 in the bill for $113.56, and $12 on November 7th, making in all $26. But, taking the testimony most favorable to the libelant, and resolving all the doubts and confusion in its favor, all the damage that can possibly be traced to the Mascot is $365.74.

[6] In an accident or breach of contract, it is the duty of the injured party, to use due diligence to reduce, and not to increase, the damages to be paid by the party in fault. Pennsylvania Railroad Co. v. Washburn et al. (D. C.) 50 Fed. 335; The Oregon, 55 Fed. 666, 673, 5 C. C. A. 229; Wicker v. Hoppock, 73 U. S. (6 Wall.) 94, 99, 18 L. Ed. 752; Warren v. Stoddart, 105 U. S. 224, 229, 26 L. Ed. 1117. With a disposition to minimize damages, it is incredible that damages, which at libelant's own figures cost only $465.30 to repair completely, could honestly be stretched, even in unusual times, to a just claim of $6,291.-37. If the leaking was due to the collision on July 16th, and it was not necessary to make repairs before October 18th, we are not impressed with the attempt to show the necessity of making them before the Reed was laid up for the winter, 27 days later, in which case the detention damages would not have been suffered.

The libelant did nothing to minimize the damages, but seemed bent on increasing them. It claimed 23 days demurrage detention, which it has abandoned, and now admits is untenable; it claimed wages for the members of the crew at a time when some were working for it at other work and elsewhere, others had gone home on account of illness, another "went home on urgent call," and one "left without letting any one know he was going"; it charged for fuel which it did not use during the time of detention; it did not make disclosure of any other collision, and sought to fasten the cost of all repairs on the Mascot, when it must have known that some of them were due to another collision, to age and use of the boat, or to both.

A large part of this record is due to the libelant's attempts to establish untenable claims, and it should bear one-half the cost. Therefore the decree of the District Court is modified as follows: Libelant's

claims for detention and "excess handling charges on lumber" are disallowed, and its claim for repairs is allowed to the extent of $365.74, and one-half the costs.