J. R. ATKINS, doing business as Alabama Fruit and Produce Company, as Owner of the MV Rio Sixaola, Libelant,

v.

ALABAMA DRYDOCK & SHIPBUILD-ING COMPANY, a corporation, Respondent.

No. 2675.

United States District Court
S. D. Alabama, S. D.

April 18, 1960.

Pillans, Reams, Tappan, Wood & Roberts, and Johnston & Johnston, Mobile, Ala., for libelant.

Hand, Arendall, Bedsole, Greaves & Johnston, Mobile, Ala., for respondent.

DANIEL HOLCOMBE THOMAS, District Judge.

Libelant brings this action in admiralty, seeking recovery of damages as the result of an alleged collision on the night of February 26, 1958, between the drilling rig El Dorado, under construction in respondent's yard, and libelant's MV Rio Sixaola.

It is the contention of the libelant that the El Dorado broke loose from her mooring on the night in question, drifted uncontrolled across the Mobile River, and collided with the Rio Sixaola, thereby causing physical damage to her and resulting in the loss of use plus expenses incurred while she was undergoing repairs. The respondent strenuously denies there was a collision and contends further, in the alternative, that if the vessels did collide, it is free from liability under the theory of *force majeure*.

This cause came on for trial on the pleadings and the evidence, the greater portion thereof being testimony of witnesses before the Court; and due deliberation having been had thereon, the Court now makes the following Findings of Fact and Conclusions of Law.

### Collision Aspect

On February 26, 1958, the MV Rio Sixaola, a wooden vessel, was moored by

four lines alongside the L & N Wharf, port side to the wharf, in Mobile River, Mobile, Alabama.

Between ten-thirty and eleven in the evening, a thunderstorm with wind gusts up to 82 m. p. h. struck in the area of Mobile, Alabama. The United States Weather Bureau had forecast thunderstorms with winds of 30 to 35 m. p. h. expected and with gusts up to 52½ m. p. h. This forecast was given at 3:30 p. m. Sustained winds of approximately 39 m. p. h. with gusts up to 82 m. p. h. were recorded by the United States weather station, located approximately ten miles from the L & N Wharf, between 10:38 p. m. and 10:43 p. m. Testimony of witnesses was to the effect that these winds lasted from ten to fifteen minutes and were estimated to be from 60 to 65 m. p. h. in the area of the Mobile River.

During the course of these high winds, the El Dorado broke loose from her mooring on the west bank of Mobile River, where she was being constructed by respondent, and drifted, uncontrolled, with the wind toward the east bank where the Rio Sixaola was moored. There were no lights on the rig and no means by which to control her course of direction.

The master and the mate of the Rio Sixaola had put out additional mooring lines at the beginning of the storm and were in the process of completing this task when the mate saw the rig approaching on the starboard side. Both the mate and the master testified that they never saw an actual impact but felt an impact, and heard a sound similar to a wooden box breaking. The two-inch stern mooring lines of the vessel immediately broke and she swung around, her port bow lines still intact, into the river, finally coming to rest with her starboard side alongside the wharf. Her power lines severed at this time, and while swinging out into the river, she was a darkened ship.

Several workmen, who were aboard the El Dorado while she was adrift, testified that the drilling rig [1] never came within forty feet of the wharf; another workman, who was on the east bank of the river approximately one half mile from the location of the Rio Sixaola, testified the rig missed the vessel by as much as one hundred feet. A seaman who was on board a vessel, the Ampala, which was moored directly astern of the Rio Sixaola, testified that the rig "missed the Ampala by about ten feet" and struck the Rio Sixaola along her starboard side.

The veracity of the testimony of these witnesses is not questioned; however, the evidence of impact does not terminate with the testimony of these witnesses. A joint survey was made of the Rio Sixaola after the alleged collision by surveyors representing both the libelant and the respondent [2]. Libelant's surveyor testified that the vessel suffered damages to her starboard side amidship, starboard bow, and port side guard rail as determined by the original joint survey. The physical facts are clear that something struck the vessel and that she was damaged. There was no evidence introduced by either side showing there were any other vessels in the Mobile River near the Rio Sixaola's position on this particular night.

Upon this evidence I am of the opinion that the El Dorado did strike the Rio Sixaola a glancing blow along her starboard side on the night in question.

### Adequacy of the El Dorado's Mooring

Respondent has strongly argued, in the alternative, the defense of inevitable accident. The burden of proving such a defense rests heavily upon the party asserting the same, and that party must affirmatively show that the breaking away of the vessel could not have been prevented by the use of that degree

---

1. In order to better visualize the size of the drilling rig, the following dimensions are given: Height, above water, measured to the tip of the highest mast, 153 feet; length, 300 feet with a 200 foot beam; draft, 7 feet; weight, 4,672 long tons; height of cylindrical pontoons at extreme outer edges of structure, 65 feet; diameter of pontoons, 20 feet, 6 inches. The structure appears similar to the frame work of a three story building with a closed-in platform atop the structure.

2. The surveyor representing the respondent was deceased at the time of the trial.

of reasonable care and attention which the situation demanded.[3] Thus, it became the duty of the respondent to prove the accident was inevitable, and I am of the opinion that it has failed to carry the burden of proof.

The drilling rig was moored with approximately thirty two-part lines of steel cable, averaging one inch in diameter and arranged in a system of bow, stern, breast, and spring lines which ran from chocks and bitts on the inboard side of the rig to shackles secured to mooring rings which were imbedded in the concrete dock surface. None of the lines were of manila rope. There were no guy wires fastened higher up the structure; the only lines were those described above which ran from the dock to the chocks and bitts on the inboard side of the rig at dock level.

Respondent admits that no extra precautions were taken to better secure the rig, and endeavors to justify this by stating it had no warning that the winds would reach the velocity actually reached. The fact that the rig had been moored in its same location for at least one month prior to its breaking loose, does not indicate that it was properly moored for the conditions expected on the night of the collision. Respondent argues that the last weather forecast forewarned only of thunderstorms with winds of 20 to 35 m. p. h. expected, and consequently the rig was properly moored to endure the conditions which were reasonably expected.

The United States Weather Bureau meteorologist testified that while these winds were unusual, gusts of one-third to one-half additional force "usually" accompanied winds of this nature. Therefore, respondent could have anticipated winds to be in excess of 35 m. p. h. up to approximately 52½ m. p. h. This forecast having been received by respondent at 3:30 p. m., there was ample time to better secure the rig for the antici-

pated conditions. True, there was not enough time to flood the pontoons, as suggested by the libelant, but respondent could have put out anchors, fastened guy wires higher up on the structure to relieve some of the strain on the cable lines, and equalized the tension on those lines already out.

There were at least three persons on the dock where the rig was moored whose responsibility it was to check the mooring of respondent's vessels. While these men are all employees of the respondent, not one was produced in court to testify as to the manner in which the El Dorado was moored. One witness was produced who testified as to the mooring, but he had left the docks some hours prior to the thunderstorm. This witness also testified that the damaged cables, clamps, hooks, chocks and bitts were recovered and stored after the accident, but that they had since disappeared and were not available for inspection.

In view of these facts, I am of the opinion that respondent did have sufficient warning to secure more adequately the El Dorado against the conditions which were expected, and that it failed to do so. Therefore, respondent has failed to carry the burden of proving an inevitable accident.

### Vessel Damage

The surveyor's original report revealed that the Rio Sixaola had been damaged on the starboard bow, forward of the starboard beam—near midship, and on the port guard rail. After preparing his survey, the surveyor accepted bids on the repair work and awarded the contract to Harrison Brothers Drydocks & Repair Yard, whose bid was in the amount of $14,374.50. This bid included, among other things, replacement of 10% new fastenings, hardening of other fastenings, and removal of the fuel tanks by removing the side plankings. Actually, the fuel tanks were removed through the

---

3. The Rob, 2 Cir., 1941, 122 F.2d 312; The Louisiana, 1865, 70 U.S. 164, 3 Wall. 164, 18 L.Ed. 85; The Chickie, 3 Cir., 1944, 141 F.2d 80; Maryland Shipbuilding & Drydock Co. v. Patapsco Scrap Corp., D.C.Md.1959, 169 F.Supp. 605; Swenson v. Argonaut et al., 3 Cir., 1953, 204 F.2d 636.

tank compartment bulkhead at a savings of $7,000. Harrison Brothers, upon approval of the surveyor, utilized this savings to install 100% fastenings instead of the 10% originally called for in the specifications.

After work was begun and several boards removed, it was found that additional repairs in the amount of $6,641 would be necessary to correct the damages found. This additional amount was approved by the surveyor.

The testimony of Harrison was that his company gave libelant a discount of $1,000 upon payment of the bill. Libelant admits that this amount should be deducted from the $14,374.50 figure.

In addition to the damage revealed by the two surveys, libelant claims damages in the amount of $1,109.37 for surveyor's fee, $50 for adjustment of the vessel's compass, and $149.47 for replacement of the severed lines.

Respondent has objected to several items of damages listed on the surveys. The more strenuous of these objections, in addition to an objection to utilization of the $7,000 savings realized by an alternate method of removal of the fuel tanks for the installation of 100% fastenings, were to (1) the replacement of eleven boards on the round of the starboard bow and (2) the removal for examination of the port and starboard propeller shafts and their re-installation.

The evidence shows that the propeller shafts were removed to inspect the possible misalignment of the shaft bearings. This was determined necessary by the surveyor when vibrations were experienced in the vessel indicating possible misalignment. I think this is a reasonable item of damages.

The eleven planks were replaced on the starboard bow. Inasmuch as the Court has reached the conclusion that the collision occurred on the sta:　ard side, it is reasonable to hold that this damage occurred as a result of the collision. This is not difficult to conclude when one visualizes the numerous projections extending from the drilling rig and the direc-

tion of swing the vessel took immediately following the impact.

■　With regard to the $7,000 saved by the use of an alternate method to that called for in the specification, I do not think libelant was justified in utilizing this savings to replace 100% fastenings in the vessel when the contract originally called for only 10%. An injured party has a duty to minimize his damages, and should not be allowed to recover damages which might have reasonably been avoided. The Nyland, D.C. Md.1958, 164 F.Supp. 741; Isthmian S.S. Co. v. Jarka Corp. of Baltimore, D.C.Md. 1951, 100 F.Supp. 856. There was no evidence offered that an additional 90% of fastenings was either necessary or reasonable to restore the vessel to its pre-collision condition, other than the fact that a number of fastenings required hardening; therefore, respondent should be given credit for the money saved. Bleakley Transportation Company v. Colonial Sand & Stone Co., 2 Cir., 1957, 245 F.2d 576.

■■　Libelant is entitled to have the vessel restored to the condition in which she was prior to the collision, but no more than this. The Baltimore, 1869, 8 Wall. 377, 75 U.S. 377, 19 L.Ed. 463. There was evidence that a great deal of wood in the Rio Sixaola was badly deteriorated and had to be replaced with good wood in order to repair damaged parts. It would appear that the libelant has attempted to put the vessel in 100% condition, when it is clear that this was not its condition prior to the collision. Particularly illustrative of this situation were the repairs effected to the after bulkhead in the fuel tank compartment, the transverse web frame in the fuel tank compartment, and the overhead deck beams which were found to have started seams. All of these were found to be in a deteriorated condition. Some of these repairs were made in areas of the vessel far from the point of impact and there was no evidence that they were occasioned by the collision. The cost of repairing these items was approved by the surveyor after the vessel was placed

in drydock, and was not included in the original survey. The evidence is not clear as to the amount of rotten or deteriorated wood that was replaced, but it is definitely established that the condition existed. I am of the opinion that libelant should not recover damages of the respondent on these items due to the fact that it has failed to minimize its damages. It violates reason to find that a responsible party should be obligated to replace in a new condition that which was deteriorated prior to the time he became responsible. Libelant is entitled only to have the vessel restored to her previous condition. I also find the evidence vague as to whether or not these damages were occasioned by the collision. Libelant has attempted to fasten repairs on the El Dorado, when it must have known some of them were due to age and use of the vessel. The Mascot, 3 Cir., 1922, 282 F. 766.

■ There is a claim for $50 which was incurred when it was found the ship's compass needed resetting. There was absolutely no proof that the compass was in excellent working order prior to the collision. In the absence of such proof, I do not think this item should be allowed.

■ There is also a claim for $149.47 for replacement of the two-inch manila line which was broken at the time of the collision. The evidence shows that a 4½-inch manila line was purchased to replace the two-inch line. (L-13) While replacement of the line would normally be a recoverable item of damages, it is evident that libelant has not attempted to replace the line with material similar to that lost. Therefore, I disallow recovery of this item.

In summary, libelant is entitled to recover as physical damages the amount of $10,672.87 [4], which is the sum total of those items which the Court has determined are reasonable to restore the Rio Sixaola and which are supported by evidence.

### Demurrage

■ Libelant claims demurrage for the loss of profits during the period of time the vessel was undergoing repairs as a result of the collision. It is well settled that demurrage is a proper element of damages; however, the amount must be proven with reasonable certainty. The Conqueror, 1896, 166 U.S. 110, 17 S.Ct. 510, 41 L.Ed. 937.

The Rio Sixaola was out of operation from February 26, 1958 until she was returned to duty on May 10, 1958, a period of seventy-three days. During this period, the libelant could not find another vessel to utilize in bringing bananas from its farm in British Honduras. A small vessel was necessary in order to navigate the waters up to the loading area in that country.

■ Of this seventy-three day period, there is no dispute but what a second accident, which occurred in the repair yard, delayed by nine days the repairs attributed to the first collision. The testimony as to what period of time was devoted to owner's repairs and what pe-

---

4. This figure was determined from the following computation:

| | | |
|---|---|---|
| Original Survey | | $14,374.50 |
| Additional Survey | | 6,641.00 |
| Survey Fee | | 1,109.37 |
| Total Claims | | $22,124.87 |
| Less: | | |
| Cash discount | $1,000.00 | |
| Savings by Alternate method | 7,000.00 | |
| Deck house repairs | 1,495.00 | |
| After Bulkhead of fuel tank compartment, portside | 971.00 | |
| Transverse web frame fuel tank compartment | 986.00 | $11,452.00 |
| Amount Supported by Evidence | | $10,672.87 |

riod was devoted to repairs occasioned by the collision is somewhat confusing and the period is strongly debated by both sides to this litigation. The surveyor testified that the owner's repairs delayed the repairs by one day; the owner of the repair yard was of the opinion that these repairs accounted for ten days of the detention period. There was further evidence that the work and labor involved in placing the 100% fastenings on the ship consumed thirty days. I am not satisfied that the thirty days utilized in installing the 100% fastenings should be charged to owner's repairs. If this time had not been used as it was, it would have been consumed in installing the 10% fastenings and hardening the other fastenings as the original specifications required. I conclude that of the seventy-three days which the Rio Sixaola was detained, fifty-four days were attributable to the collision on the night of February 26, 1958 [5].

■ Libelant has argued that the loss of profits should be measured by the number of bananas brought from its farm on its previously owned vessel, The Roatan, as well as those brought on the voyages of the Rio Sixaola. This is not a proper yardstick because the Roatan's cargo capacity exceeded that of the Rio Sixaola by almost one hundred tons. There is enough evidence before the Court concerning the voyages of the Rio Sixaola to enable it to determine the profits. This vessel made nine voyages to British Honduras, two prior to and seven subsequent to the accident; therefore, there is no necessity to look to the voyages of the Roatan inasmuch as this is an adequate number upon which to base an average.

■ The Rio Sixaola made approximately one voyage every fifteen days to British Honduras. It is reasonable to assume she would have made as many as four voyages during the fifty-four day period of detention. The average sales price per voyage of bananas carried on the nine voyages amounted to $3,130.37, less $1,919.55 for operational costs and $244.58 for stevedoring costs (this latter figure being based upon .172 times 1422, the average number of stems carried) netting $966.24 per voyage. This figure multiplied by four equals $3,864.96. There was evidence that libelant was required by a unique contract with the government of British Honduras to buy the bananas produced by neighboring farmers. I think the average cost per voyage for fruit purchased from others should be subtracted from the profit figure arrived at above. This amounted to $1,155.84 for four voyages ($288.96 per voyage). The amount of demurrage to which the libelant is entitled is $2,709.12.

### Expenses

■ During the period of detention, libelant kept the full crew of seven aboard the vessel working on owner's repairs. It was originally anticipated that the vessel would be in drydock for a period of approximately twenty days. All of the crew were residents of South American countries. Under such circumstances, it becomes the owner's decision as to what is the most economical method to employ with regard to the disposition of his crew. Here, the owner testified he thought it was more economical to retain the crew for the anticipated period of time rather than return them to their homes. When it appears to the court that the owner has exercised reasonable judgment in such circumstances, his decision will not be questioned. For this reason, I allow recovery for the expenses incurred in maintaining the crew. The average daily cost for food, miscellaneous supplies and expenses amounted to $51.28 for a period of fifty-four days. Libelant is entitled to

---

5. The figure of fifty-four days was arrived at by attributing nine days to repairs necessitated by the second accident and ten days to owner's repairs, which from the evidence appears to be the most reasonable period of time.

recover $2,769.12 [6] for expenses incurred in maintaining the crew.

▆ Libelant's claims of insurance premiums and 10% overhead costs during the detention period are not recoverable items of damages. The Tremont, 9 Cir., 1908, 161 F. 1; The Baltimore Maru, 5 Cir., 1926, 11 F.2d 836; Moore-McCormack Lines, Inc. v. The Esso Camden, D.C.N.Y.1956, 141 F.Supp. 742.

▆ There is also a claim of depreciation for this period of detention which is not supported by the evidence. For this reason, I disallow it. I do not think such an item could be proved because it is inconceivable that there could be liability for depreciation at the same time restoration is being effected. Admittedly, depreciation is a customary bookkeeping entry, but one entitled to damages should not be permitted to recover on an expense that will be accrued for regardless of whether the vessel is on dry dock or at sea.

Conclusions of Law

1. The court has jurisdiction of the parties and the subject matter of the litigation.

2. The El Dorado did strike the Rio Sixaola on the night of February 26, 1958.

3. The El Dorado was not properly moored by Alabama Drydock & Shipbuilding Co., and respondent has failed to prove the defense of inevitable accident.

4. Such faulty mooring was the sole proximate cause of the damage to the Rio Sixaola, as indicated in the above opinion.

5. Physical damage to the Rio Sixaola amounted to $10,672.87.

6. Demurrage was suffered by libelant in the amount of $2,709.12.

7. Expenses incurred by libelant while the vessel was detained amounted to $2,769.12.

Decree in accordance herewith will be entered.

6. Monthly crew expenses were as follows: pay, $1,075; food, $213.66; miscellaneous supplies and expenses, $250. The monthly average cost was $1,538.66 for a daily average (30 day month) of $51.28.