PATTERSON TERMINALS, INC.,
Libellant,

v.

S.S. JOHANNES FRANS, her engines, boilers, tackle, apparel, etc., and Canadian Foreign Steamship Co., Respondents,

and

Taylor & Anderson Towing and Lighterage Co., Impleaded Respondent.

No. 467 of 1958.

United States District Court
E. D. Pennsylvania.

Sept. 26, 1962.

Eugene R. Lippman, of Krusen, Evans & Byrne, Philadelphia, Pa., for libellant.

Harrison G. Kildare, of Rawle & Henderson, Philadelphia, Pa., for respondent.

Benjamin F. Stahl, Jr., of Clark, Ladner, Fortenbaugh & Young, Philadelphia, Pa., for impleaded respondent.

VAN DUSEN, District Judge.

This admiralty action is brought to recover damages to a dolphin or caisson connected to a pier of libellant resulting from a collision between the ship JOHANNES FRANS and this dolphin (caisson #3). The accident occurred as the ship, assisted by two tugs belonging to the impleaded respondent, was maneuvering under her own power into the berth at No. 1 Pier of the libellant's wharf on the Delaware River ·at Paulsboro, New Jersey (see Exhibits L-1 and L-1A for drawing of the pier and caissons).

The FRANS was not too large for the berth at Pier 1 and no larger than libellant's superintendent (Mr. Barton) would have expected to be moored at this pier. This ship was scheduled to berth at the Patterson Terminals dock for the purpose of refueling in the afternoon of October 11, 1958. Arrangements were made to have assistance in such berthing from impleaded respondent.[1] The vessel arrived at Mantua Creek Anchorage at or about 1454 hours on October 11, but was unable to berth immediately because of the presence of another tanker at the berth which the JOHANNES FRANS was to use. Two of impleaded respondent's tugs (the TANDA 10 and the J. M. TAYLOR) arrived at or about 2300 hours and were ordered to stand by the FRANS to assist her when the berth was free. When the tugboat assistance was requested, the number of tugs to be used was not specified, such matters being left to the discretion of the tugboat company.

The vessel left the Mantua Creek Anchorage at or about 0117 hours, October 12, 1958, under the command of the docking pilot, Captain L. Howard. Captain Howard, an employee of the impleaded respondent, was Captain of the TANDA 10 and boarded the JOHANNES FRANS about 0110 to take over his duties as docking pilot.[2]

1. The vessel was under bareboat charter to Canadian Steamship Co. and the request for tug assistance was by Canadian's agent, Isbrandtsen (Pa.), Inc. Said assistance was rendered subject to a contract between Isbrandtsen and Taylor & Anderson, which will be discussed more fully at a later part of this opinion.

2. Captain Howard first boarded the ship at about 2300 hours on October 11 and then left it until it was time for him to come aboard as docking pilot. He stayed in the vicinity of the ship during that interval.

The vessel was headed upstream into the then ebbing tide and brought abreast of the pier, the weather being clear, visibility good, and the wind blowing from the northwest at a force (approximately Beaufort 4, being 11 to 16 knots— R–14 shows a weather bureau calculation of 10 knots at 0155) not unusual for that time of year. The two tugs were placed at the vessel's starboard side (the J. M. TAYLOR was at the bow, the TANDA 10 was at the stern) and the tugs' engines operated in an ahead direction at a speed sufficient to permit the wind to ease the JOHANNES FRANS in toward her berth. When the vessel was approximately 80 to 100 feet off the pier, the bow of the vessel began to swing faster than the stern.[3] To slow the bow movement, the bow anchor was let go, but the stern of the JOHANNES FRANS continued to move shoreward at about 10 feet per minute, despite the counteraction of the TANDA 10. The TANDA 10 was maneuvering at an angle insufficient to hold the larger vessel, having been forced to change its position from one approximately 45° (having initially been at a 90° head-on position) from the broadside of the JOHANNES FRANS to one only about 10° from the broadside of that vessel because of the danger of being caught between the respondent vessel and the pier. The presence of the barge PATOIL, owned by libellant, which was at all pertinent times docked in the barge berth directly behind Pier No. 1, with part of the barge extending past the side of the pier, limited the maneuverability of the TANDA 10.

The stern of the JOHANNES FRANS contacted the downriver dolphin of libellant's pier at approximately 0206 hours, October 12, 1958, with a more than usual force. It is that collision which is the subject matter of this suit, damages being sought for damage alleged to have been caused to said dolphin by the impact.

When a moving vessel strikes a stationary object, such as a wharf, an inference of negligence arises and the owners of the vessel then have the burden to rebut the inference. General Petroleum Corp. v. City of Los Angeles [Hakonesan Maru], 42 Cal.App.2d 591, 109 P.2d 754, 1941 A.M.C. 510, 513 (1941). In admiralty, this presumption does more than merely require the ship to go forward and produce some evidence on the presumptive matter. The moving vessel must show that it was without fault or that the collision was occasioned by fault of the stationary object or was the result of inevitable accident. Carr v. Hermosa Amusement Corporation, Limited, 137 F.2d 983, 985 (9th Cir. 1943).

As Senior Judge Kirkpatrick stated in Patterson Oil Terminals v. The Port Covington, 109 F.Supp. 953 (E.D.Pa. 1952), at page 954:[4]

> "The common sense behind the rule makes the burden a heavy one. Such accidents simply do not occur in the ordinary course of things unless the vessel has been mismanaged in some way. It is not sufficient for the respondent to produce witnesses who testify that as soon as the danger became apparent everything possible was done to avoid an accident. The question remains, How then did the collision occur? The answer must be either that, in spite of the testimony of the witnesses, what was done was too little or too late or, if not, then the vessel was at fault for being in a position in which an unavoidable collision would occur.

> "The only escape from the logic of the rule and the only way in which the respondent can meet the burden is by proof of the intervention of some occurrence which could not have been foreseen or guarded against by the ordinary exertion of human skill and prudence—not nec-

---

3. It is alleged that the movement of the bow was caused by a sudden gust of wind or because of the combination of the steady wind and the current.

4. This case was affirmed by the United States Court of Appeals for the Third Circuit. See 205 F.2d 694 (3rd Cir. 1953).

essarily an act of God, but at least an unforeseeable and uncontrollable event."

■ The respondent and impleaded respondent have not met the burden of disproving the negligence, which burden the law casts upon them under the facts in this case. It has not been proved to the satisfaction of the court that some "unforeseeable and uncontrollable event" occurred which could not have been seen or guarded against.

■■ As to the responsibility of the parties, the respondent and impleaded respondent should both be held responsible to the libellant. The presumption of negligence arising from a vessel's collision with a stationary object operates against all parties participating in the management of the vessel at all times when negligent management was a factor causing the collision. Patterson Oil Terminals v. The Port Covington, supra, at p. 955. During the maneuvering of the vessel, the Captain of the JOHANNES FRANS was present on the bridge and could have countermanded or corrected the orders of the docking pilot, Captain Howard.[5] Before the vessel left the Mantua Creek Anchorage, either party could have insisted upon an additional tug if that was needed.[6] It appears that the docking pilot should have made allowances for the presence of the PATOIL when maneuvering the JOHANNES FRANS into its berth and taken steps to prevent the collision by asking that it be moved, positioning the tugs differently (for example, on the port side of the ship), using lines from tugs to the ship, asking for more tug power, giving clearer directions to the tug masters, or docking the ship farther up shore. Both respondent and impleaded respondent are, therefore, liable to the libellant in the principal action. The cross-libel will be discussed at a later part of this opinion.

*Damages*

The cost of the repairs made to the caisson or dolphin by libellant after the collision was $26,526.55. Libellant contends that it is entitled to recover this entire amount, which is agreed to have been a reasonable charge for the work done, less $600. which is admitted to have been charged for replacing the fender system that was customarily renewed at least every other year. T. H. Browning Steamship Co. v. F. H. Peavey & Co., 235 F.2d 5 (8th Cir.1956), and O'Brien Bros. v. The Helen B. Moran, 160 F.2d 502 (2d Cir.1947), are relied on for the proposition that the applicable measure of damages is the reasonable cost of repairing to an extent sufficient to put the object back to its original condition. The respondent and impleaded respondent contend that the full cost of repairs should not be awarded because the ship did not cause all the damage found after the collision, the repairs resulted in betterment of the structure, and the caisson could have been put back to its condition prior to the impact for a lesser sum. It is also argued that the damages should be reduced because the libellant was negligent in having placed the barge PATOIL in the position it was at the time of the collision.

In this case, there is no evidence as to the value of the caisson either before or after the collision. Libellant has argued that the caisson was an integral unit of the pier facility and that, therefore, the court must look to the market value of the entire facility, which is said to have had a value of $180,750. as of December 1958, and then hold that, since the cost of repair was less than this amount, it must be paid in full. This argument is rejected by the court. This breasting dolphin is not an integrated part of the pier and, although it

---

5. This is admitted by the vessel's Captain, Captain Asjes. It appears that it was at Captain Asjes' suggestion that the bow anchor was let go.

6. Captain Asjes, in fact, testified that when the docking pilot came aboard the first time, at 2300 hours on October 11, he asked him if he had enough tug power and Captain Howard said he had. (This testimony is not supported by the testimony of Captain Howard.)

affects the pier's usefulness and stability, there is no reason to treat it as such an integral part thereof that the market value of the entire pier should be considered when ruling on the applicable measure of damages for repair of this one dolphin.[7]

Although the market value of the dolphin was not made part of the record by any of the parties, the record shows that the $26,526.55 charge for the repairs was reasonable for the work done but respondent's expert witness, Mr. Cummerford, testified that the dolphin could have been repaired for no more than $10,000.[8]

When examined shortly after the collision, the dolphin showed the following damage: there was splintering damage to fender piles adjacent to the cell and to a chafing piece (part of the chafing piece was split); the steel cell was twisted and pushed 8 to 12 inches from perpendicular; there were dents in the side of the steel cell; one of the mooring posts (the upriver post) was bent about 4 inches from perpendicular toward shore; at the same level as the bend, the edge of metal decking by the post was rolled up and back about 1½ inches; the guard rail was distorted and pushed in the same direction as the cell; and there were cracks in the marble slab covering the cell.

Although the chafing piece and fender piles showed signs of new damage caused by the ship, whose paint was found on the newly splintered fender, one fender and part of the fender piece appear to have been missing prior to the collision and the libellant is not claiming damages for the cost of replacing the fender, which has to be repaired every two years. Beside the above, there was little else

to indicate that the damage to the dolphin, excluding the misalignment, was of recent origin. Among other things, it is noted that no new metal showed where the decking was bent; no new cracks were found in the cement slab; the dents in the steel plating were old. The court also holds that it is not convinced by the evidence that the collision involved caused the bend in the mooring post for the following reasons:

1. The shape of the decking behind it suggests that at some time the post had been pushed too close to the decking and the decking then bent away from the post to allow ship lines to pass between the post and the decking.

2. Because of the design of the cell and the resistance factor, before actual bending would take place, the force exerted on the caisson would have to be sufficient to displace, or at least disturb, the cell before the piles actually started to bend.

3. The other mooring posts shown by exhibit testimony (e. g., IR–4) do not appear to be on an exact perpendicular.

4. If the ship hit the caisson with enough force to bend the mooring post, the ship would have been damaged to a much greater extent than the small dent and paint scraping which was caused thereby.

The court also finds that the steel cell was already twisted and pushed inshore prior to the collision. The force which caused the old dents in the steel plating could have displaced the cell in the same direction as the ship was alleged to have done, or there could have been some other unknown force prior to the impact in-

7. See Patterson Oil Terminals v. The Port Covington, supra, which involved a dolphin similar to the one in this case and where the dolphin was viewed as a separate structure by Senior Judge Kirkpatrick. There are four dolphins at this pier.

8. There was contrary testimony. However, it is noted that another expert

stated that his recommendation that the caisson be repaired in the manner it was was based on his assumption that the libellant company wanted the caisson to be repaired in the same manner as another which was already undergoing repair or rebuilding (see Exhibit IR–4, showing work being done on the other caisson).

volved in this accident.[9] Although the impact of the JOHANNES FRANS may have caused the cell to be displaced to the full 12 inches from perpendicular, as was found shortly after the accident by at least one witness, the evidence noted above makes it impossible for the court to find that the cell was perfectly perpendicular until the impact and then immediately became twisted and displaced 12 inches toward shore with so relatively few marks of recent damage.

The repairs made to the caisson greatly enhanced it by making it bigger, much more stable than before, giving it the ability of accommodating larger ships, and prolonging its expectancy of usefulness.[10] In actuality, the repairs gave to the libellant a dolphin which was so improved that it could be considered not only bettered but new and which corresponded to the rebuilding already being done on other of its dolphins.

■■ The libellant will not be permitted to recover the full cost of repairs.

"It violates reason to find that a responsible party should be obligated to replace in a new condition that which was deteriorated prior to the time he became responsible."[11] If some of the repairs are required because of age, deteriorated condition, service, or because of prior collisions, the entire cost of the repairs will not be allowed as damages.[12] In this case, the dolphin had a 25-year life expectancy when it was built in 1946. Therefore, in October 1958, it had depreciated to approximately 50% of its value. At the time of the impact with respondent vessel, there was already a lot of damage present, including the dents on the plating, the bent mooring post, the cracks in the cement slab, and some inshore twisting to the steel cell. As stated previously in this opinion, the court finds that the vessel further damaged the steel cell by pushing it even more inshore than it had been previously and that this additional misalignment, caused by the unusually hard impact of the

9. As pointed out by impleaded respondent at pages 5–6 of its brief:

   "We can, however, postulate certain potentials and indicia of damage, which, cumulatively, compel a conclusion of gradual decrease of serviceability:

   "1. Dolphin No. 3 was built in 1946–47.

   "2. Between 600–700 ships were berthed at libellant's two ship berths during the five years preceding our episode (Barton, N. T. 114).

   "3. Many of these vessels were larger than the JOHANNES FRANS (DeGrosa and Howard, N. T. 134, 645).

   "4. Dolphin Nos. 1 and 4 are set back, closer to shore, so the brunt of impacts occurring during docking or while berthed must be taken exclusively by Dolphin Nos. 2 and 3. (See sketch of Terminal).

   "5. A vessel at the Patterson Terminals is subject to

   "a. wind sweeping across the river and

   "b. wash of passing vessels

   with no provision, by outboard lines or camels floating between ship and dolphins, to prevent any buffeting from being transmitted directly to Dolphin Nos. 2 and 3.

   "6. We do know that periodic damage befell Patterson's dolphins. Dolphin No. 1 at Pier No. 2 was damaged in 1948;

   in Patterson Oil, Inc. v. Tug PORT COVINGTON, 109 F.Supp. 953, Judge Kirkpatrick found [damage to another dolphin] * * *.

   Mr. Shelly testified that seven pieces of steel piling were replaced in 1953 in the dolphin in question and Mr. Barton was aware of about 10 accidents in a period of five years (N. T. 195, 114). These are some known damages. A ship pounding against the dolphins in a north wind could easily cause undetected damage."

10. The life expectancy of the dolphin when repairs were finished was 25 years, the same as that of a completely new dolphin.

11. J. R. Atkins v. Alabama Drydock Co., 195 F.Supp. 944, 1961 A.M.C. 909 (S.D. Ala.1960).

12. For the proposition that there should be a deduction of proper depreciation due to the age and deterioration of the structure, see Silver Moon—Tug Cleveland, 1959 A.M.C. 1172 (E.D.N.Y.1959); Exner Sand & Gravel v. Maher Steve. Corp., 1955 A.M.C. 2286 (D.Ct.N.J.1955) (Opinion of Judge William F. Smith); General American Trans. Corp. v. The Patricia Chotin, 120 F.Supp. 246, 249 (E.D.La.1954); O'Brien Bros. v. The Helen B. Moran, supra, 160 F.2d at page 505.

ship, necessitated repair of the dolphin which was already damaged and deteriorated.[13]

The cost of repairs (excluding the $600. for which reimbursement is not requested) will be reduced by 50% for previous deterioration and damage and also will be further reduced by 20% because of the betterment to the caisson through the enlarging thereof. Libellant is, therefore, entitled to recover from both respondent and impleaded respondent $7,777.96.[14] A judgment may be submitted by libellant within ten days for that amount.

Because of the evidence in this case to the effect that libellant attempted to hold respondent responsible for damages which were obviously not caused by it and because of the difference between the amount of damages assessed and the substantial amount which libellant demanded for the rebuilding and bettering of the dolphin, the court will not grant interest on the amount of the judgment for the period of time between the date libellant paid for the repairs and the date of this opinion. See judgment entered without interest in Patterson Oil Terminals v. The Port Covington, supra, (Document No. 25 in No. 149 of 1949 in Admiralty). Respondent and impleaded respondent will, however, be liable for interest at 6% from this date until the judgment is paid and for costs.

### The Cross-Libel

The impleaded respondent is entitled to judgment in its favor on its cross-libel (Document No. 11) against respondent Canadian Foreign Steamship Co., Ltd. The towing company supplied the tugs under its contract with Isbrandtsen, which contract contained the following clause (D(8) of IR–8):

"Whenever the Master or other officer of any tug or any licensed pilot goes on board a vessel to assist her movement or handling, he becomes and continues to be solely the servant of said vessel and her owners in respect to all acts done by him and all orders given by him to any tugs engaged or to said ves-

13. Although there was testimony as to the lack of stability of the caisson, at the time of the impact in October 1958, the court does not hold that it was unfit for the use to which it was put in view of the many moorings which occurred prior to that time. Many of the vessels so moored were larger and heavier than the respondent vessel and the collision which caused the dents in the plating and the previous inshore twisting of the steel cell must have occurred long before the October 1958 date, but there is no evidence that the dolphin was not usable on the 1958 date here involved.

———◆———

14. This amount is computed as follows:

| | | |
|---|---:|---:|
| The cost of repairs | | $26,526.55 |
| Less amount agreed to be for annual repair | | 600.00 |
| | | |
| Net cost of repairs | | $25,926.55 |
| Less: 50% depreciation | $12,963.28 | |
|     20% betterment | 5,185.31 | 18,148.59 |
| | | |
| Amount of recovery by libellant | | $ 7,777.96 |

This is a reasonable figure. At most, the cost of repair would have been $10,000. under Mr. Cummerford's testimony, but that figure was a maximum one. It is noted that the repairs done as he suggested would also have resulted in a betterment to the dolphin as it existed prior to the collision (N. T. 543–4). Libellant offered no evidence as to the cost for particular items of the repair work (L–14 merely shows amounts, with no indication as to what work was covered by the charges). The repairs made the dolphin much larger and more stable, made it able to dock larger boats, gave it a longer life expectancy; hence, it is appropriate to consider that there was a 20% betterment.

sel or otherwise in the movement or handling of said vessel; and none of the tugs or their owners, agents or charterers shall be responsible or liable for any claims or any damages caused by or resulting from such acts or orders."

[10] The accident here was caused by the negligence of Captain Howard in his capacity as docking pilot; therefore, the towing company is not responsible for said negligence. Sun Oil Co. v. Dalzell Towing Co., 287 U.S. 291, 53 S. Ct. 135, 77 L.Ed. 311 (1932).[15] The court does not accept the contention of respondent that the towing company was negligent in not supplying more tugs in view of the uncontested testimony that heavier and bigger ships were often docked at this pier and that not more than two tugs had even been used. It is also noted that the wind was not unusually high for the season of the year, that there is no contention that the wind alone caused the collision, or that the towing company should have supplied more tugs merely because of the wind.[16] Captain Howard directed the operations and was negligent in that he could have done several things to avoid the impact.[17] His negligence was in his capacity as docking pilot and, therefore, the towing company is not responsible for it. There was no negligence of the towing company or the other employees thereof which contributed to the collision [18] and

this company is, therefore, entitled to a judgment in its favor on the cross-libel for indemnity for any amount for which it is held responsible in the principal action. An appropriate judgment and order in accordance with this opinion may be submitted within ten days by the impleaded respondent.

Libellant's Requests For Findings of Fact (Document No. 41) Nos. 1–5, 6 (as modified by substituting "as well as" for the word "with" in line 2), 9 (as modified by adding the following sentence to the request: "The breasting dolphins are intended to stop the ships when mooring within normal docking forces."), 11, 13, 17, 18, 19 (as modified by eliminating the first sentence thereof), 20, 21, 24, 25, 29, 30, 36, 38 and 42 are AFFIRMED; its Requests Nos. 12, 14, 15, 22, 23, 26, 31–35, 37, 39 and 40 are DENIED.

The following Requests on Behalf of SS. JOHANNES FRANS and Canadian Foreign Steamship Company, Ltd. (Document No. 42) are AFFIRMED: Nos. 2–5, 7, 9–13, 18, 26, 31 and 32. Their Nos. 1, 6, 8, 25, 26, 27, 29 and 33 are DENIED.

The Requests of impleaded respondent (Document No. 43) Nos. 3, 4, 10, 12 and 13 are AFFIRMED; its Requests Nos. 1, 2, 8 and 11 are DENIED.

All Requests For Findings of Fact submitted by the parties which have not

---

15. This decision is still the applicable law in situations such as the one presented to the court in this case. See Bisso v. Inland Waterways Corp., 349 U.S. 85, 92, 75 S.Ct. 629, 99 L.Ed. 911 (1955), and United States The S. S. Christopher Gale v. Nielson, 349 U.S. 129, 131, 75 S.Ct. 654, 99 L.Ed. 939 (1955).

16. Note that the Captain of the respondent vessel indicates that it was the current, not the wind, which caused the ship to move the way it did (see Exhibits HR–2 and 2A). The trial judge finds that there was no sudden increase in the wind force the evening of the impact. See Exhibits IR–13 & 14, which show that the wind (at the Philadelphia weather station) was 9 knots at midnight, 19 at 1 A.M. and 10 at 2 A.M. Indeed, it

is probable that the wind, blowing in the direction it was on the night in question, was some help in the docking operation in that it would carry the vessel sideways toward her ultimate berth.

17. For instance, Howard could have ascertained whether or not the barge PATOIL was at the berth as the docking maneuvers were taking place and allowed for its presence by conducting the docking differently, asking that the tug be removed, asking for more tugs, etc. See, also, pp. 5–6, supra.

18. The respondent's arguments to the effect that the negligence occurred because of Howard's negligence before he boarded as docking pilot and that the impleaded respondent and its employees were negligent are not persuasive.

been specifically ruled on are denied insofar as they are inconsistent with this opinion. The Requests of the parties which have been affirmed and the facts contained in the opinion constitute the Findings of Fact of the court.

All Requests for Conclusions of Law which are inconsistent with the foregoing opinion are denied.