**SOCONY-VACUUM OIL CO. Inc., v. SMITH.**

No. 12708.

United States Court of Appeals,
Fifth Circuit.

Jan. 25, 1950.

Samuel C. Lipscomb, Beaumont, Tex. A. D. Lipscomb, Beaumont, Tex., for appellant.

George E. Duncan, Beaumont, Tex., L. J. Benckenstein, Beaumont, Tex., for appellee.

Before WALLER, BORAH, and RUSSELL, Circuit Judges.

BORAH, Circuit Judge.

This cause in admiralty arose out of a collision in the Sabin-Neches Canal between the single screw tanker Sachem and three loaded steel oil barges which, with one other, were being towed by the tug George A. Butler upon a hawser astern.

Charles C. Smith, managing co-owner of the tug and the owner or charterer of the barges, filed a libel against the Sachem, following which the respondent-appellant filed its claim, answer and cross libel. The two libels were tried together and a final decree was entered on January 28, 1949 holding the Sachem solely at fault for the collision, fixing libelant's damages in the amount of $92,508.70 with costs, and dismissed appellant's cross libel. From this final decree the claimant of the Sachem has appealed.

The principal ground urged for upsetting the decree is that the findings of fact by the District Court, based solely on the deposition testimony of appellee's witnesses, are contrary to the weight of the evidence. The appellant also insists that this court should determine the issue *de novo*. This we shall do.[1]

The collision occurred in a straight reach of the Sabine-Neches Canal, at a point approximately 3.93 miles above the Port Arthur Pleasure Pier Bridge, at 5:25 a. m., November 9, 1945. The canal at and near the point of collision has a surface width of 500 feet, a bottom width of 350 feet and a depth of 34 feet.

The George A. Butler, a 575 horsepower Diesel tug, towing in tandem, and in the order named, the gasoline laden barges CCS 600, Foster Smith, Joseph Smith and Dave Scruggs was proceeding up the canal at a speed of between 3½ and 4 miles per hour over the ground, bound for Port St. Joe, Florida. The night was dark and clear, the wind southeast and a strong floodtide was running about three miles per hour. The barges, each approximately 186 feet long, 36 feet wide, were heavily loaded and had a freeboard of about two feet. The length of the entire flotilla was about 880 feet. After passing through the Port Arthur Pleasure Pier Bridge, with the mate at the wheel, the tug and tow proceeded up the channel on the port side of the canal near the center of the channel, and this course she pursued until overhauled by the Sachem.

At 2:52 a. m. on the morning of the day in question the Sachem, with a Sabine Bar pilot on board, left her anchorage off Sabine Pass and proceeded up channel bound for Beaumont, Texas, where arrangements had been made for her arrival at 7:00 a. m. The Sachem—480 feet long, 68 foot

1. Mosher v. Parker Brothers and Company, Inc., 5 Cir., 1950, 178 F.2d 419.

beam, 37 feet deep—was proceeding light in water ballast with a draft of 10 feet 8 inches forward and 18 feet 2 inches aft. She proceeded up channel without incident, passing through the Port Arthur Pleasure Pier Bridge at 5:08 a. m., with her engine half speed ahead. With the flood tide underfoot and the wind out of the southeast and against her starboard beam the Sachem had difficulty in maintaining steerageway and after passing through the bridge she began to sag down to the lee bank. So, in order to get back in the middle of the channel, her engine was at 5:09 a. m. put full speed ahead, and there it remained at full throttle for sixteen of the seventeen minutes immediately preceding the collision. The Sachem was being navigated from the "monkey bridge" about 50 feet above the surface of the water. Stationed on the "monkey bridge" were the helmsman, the master and the pilot. The pilot was directing the navigation of the vessel and the master was transmitting engine orders through the voice tube to the junior third mate, who was standing by the telegraph in the wheel house. The navigators of the Sachem first sighted the lights of a small vessel ahead off their port bow fifteen minutes before the actual collision. Shortly after picking up these lights and because of the numerous shore lights on the west bank, which were casting their reflections in the water, the pilot was for awhile uncertain whether the lights he saw were on the land or in the water. Concluding that they were not shore lights, the Sachem continued on at a speed in excess of 13 miles per hour over the ground even though the pilot well knew that a 7 mile per hour speed limit was prescribed for those waters. At 5:23 a. m. the engine of the Sachem was ordered half speed ahead and shortly thereafter she blew a one blast whistle requesting a passage on the starboard side of the vessel ahead. At this time the Sachem was in the middle of the channel and less than one-half mile astern of the tow. Despite the fact that the Sachem was the overtaking vessel and was bound to keep out of the way of the libelant's tow, and despite the fact that she received no signal from the overtaken vessel assenting to a passage, the pilot at 5:24 a. m. ordered a hard right rudder and full speed ahead, with the intention of passing the tow to starboard. In answering her rudder the Sachem started to swing right, and getting too far over smelled the bank and took a sheer to port. And then, when it became apparent that collision was inevitable, the engine was at 5:24 plus put full speed astern; but the tanker continued over to port, striking the stern barge in tow approximately 5 feet aft of the forward quarter bitts and slid forward along the next two barges of the tow, setting fire to all three barges.

It was conceded by the master and pilot of the Sachem that the sheering of the tanker was the immediate cause of the collision. And it is apparent the sheer would not have occurred had it not been for the high and dangerous rate of speed which the Sachem maintained right up to the moment of impact. This and this alone, in the Court's view, was the proximate cause of the disaster.[2] Careful navigation at moderate speed in this constricted channel was all that was needed to insure a safe passage, but that much caution was imperatively required.

The negligence of the Sachem was so gross as to cast upon her the burden of proving by clear and convincing evidence contributory fault on the part of the tug. Any doubts arising from such proof are to be resolved in favor of the tug.[3]

The faults claimed against the Butler are: (1) that the barges failed to display the lights required by the navigation rules, (2) that the barges were at an angle in the channel and effectively blocked the channel, (3) that the tug was proceeding up the port side of the channel in violation of the

2. The Ditmer Koel, 5 Cir., 65 F.2d 555; The Howard Reeder, 4 Cir., 207 F. 929.

3. The City of New York, 147 U.S. 72, 85, 13 S.Ct. 211, 37 L.Ed. 84; The Ludvig Holberg, 157 U.S. 60, 15 S.Ct. 477, 39 L.Ed. 620; The Umbria, 166 U.S. 404, 17 S.Ct. 610, 41 L.Ed. 1053; The Victory (The Plymothian), 168 U.S. 410, 423, 18 S.Ct. 149, 42 L.Ed. 519.

narrow channel rules, (4) that the appellee's navigator failed to answer the passing signal.

The witnesses for the Sachem swore that they saw no lights on the barges and the witnesses for the tug swore that the barges were lighted. Considering the fact that each light was a separate, independent unit, it is improbable and unreasonable to believe that, within so short a time after the tug had set sail, none of the lights were burning. Positive testimony by those on the tug, who rigged up the lights and were in a position to see them and know of their condition will not be lightly rejected because other persons, whose duty it was to have seen them, either failed to observe or happened not to see them. Negative evidence of this character cannot be accepted to outweigh positive evidence. The failure to observe a light does not disprove its existence. Applying the usual rules as to probabilities, this court should be hesitant to hold that the officers and crew of the tug would have neglected not only the commands of the law but also the requirements of prudent navigation as by so doing they would be imperiling not only the tug and its highly volatile cargo but their own lives as well.

█ A most significant circumstance bearing upon this question of lights is the fact that although the failure of the tug in this regard is made the chief basis of the steamer's defense, the fact that such lights did not exist was not noted in the log of the Sachem at the time. And this notwithstanding the fact that the statutes of the United States provide: "In every case of collision in which it is practicable so to do, the master shall, immediately after the occurrence, cause a statement thereof, and of the circumstances under which the same occurred, to be entered in the official log book." Revised Statutes, Sec. 4290, 46 U. S.C.A. § 201, subd. 12.

As was said in The Buenos Aires, 2 Cir., 5 F.2d 425, 430: "It certainly is a matter of great significance that in a matter of such vital importance as the absence or failure to see the side lights of a sailing vessel, which was sent to the bottom by a collision with a steamer, the log of the steamer made no mention of the important and essential circumstance that the bark was displaying no lights at the time the collision occurred. It is hard to believe that so important an omission would have occurred had the lights not been burning."

█ This significant conduct on the part of the steamer, together with other facts and circumstances in the case, convince us that the lights on the barges were burning at the time of the collision. Nor has the appellant shown by clear and convincing evidence that the barges did not carry a bright light on each end as required by the pilot rules for inland waters. Any doubt arising from the proof must be resolved in favor of the tug. The City of New York, supra. But if, despite evidence to the contrary, it could be rightly said that the proof shows that none of the barges save the lead barge carried a light on the bow we would still say that the barges carried five bright lights and that the presence of three more lights on the bows could not, under the facts of this case, reasonably be regarded as contributing to the collision, even though the burden of establishing this was on the tow.

█ The testimony is all one way that the tug was on the port side of the fairway but whether any of the barges were tailing toward and beyond the center of the channel presents a point on which the evidence is conflicting. The master of the Sachem testified that he first saw a barge 150 feet off the port bow, 40 feet to starboard of the center line of the canal. The bar pilot's testimony is to the same effect except that he saw the barge about 90 feet away. This testimony of the master and bar pilot in respect to distances are but poor estimates at best and are of doubtful value when considered in the light of the physical facts. Considering the fact that the steamer's forward draft was 9½ feet less than her draft aft, that the forecastle head was 35 feet above the water line, and that the gun tubs on the forecastle head were elevated an additional 15 feet above the deck, it is obvious that these witnesses did not and could not have seen the barges at that distance.

Nor could they have seen the barges within 600 to 1000 feet ahead of the bow, since their movements on the "monkey bridge" were restricted to 3½ or 4 feet on either side of the center line of the vessel, due to the presence of gun tubs on the port and starboard wings. The lookout, though inattentive to duty in that he did not report the presence of the barges in the channel nor the three lights which he had previously seen ahead, was admittedly in the most advantageous position to observe the channel ahead. Corroborating the testimony for the tug, he places the tow on the port side of the center of the channel. We accept his testimony as true.

■ The applicable Inland Rule prevailing on November 9, 1945 reads as follows: "In narrow channels every steam vessel shall, when it is safe and practicable, keep to that side of the fairway or mid-channel which lies on the starboard side of such vessel." 33 U.S.C.A. § 210, Art. 25

A fault charged against the appellee is that the tug was at a place in the channel where she had no right to be, and that since no satisfactory explanation was given for her being there, that the burden was on the tug to show not merely that her fault might not have been one of the causes, or that it probably was not, but that it could not have been one of the contributing causes of the collision, citing The Pennsylvania, 19 Wall. 125, 86 U.S. 125, 22 L.Ed. 148. It is true that the tug was on the port side of the center of the channel in violation of the statute and that the explanation which she gave for being there is not sufficient. But that did not make her an outlaw. And she is not to be condemned if she can prove that her statutory fault was a remote one and could not have contributed to the collision. The evidence indubitably shows that the Sachem was fully aware of the tug's position in ample time to navigate in reference to her and her barges so as to pass them safely. The Sachem had over 175 feet of navigable waterway within which to pass on the starboard side of the tow and could have easily avoided her by proper navigation. We accordingly hold that the violation by the Butler of Article 25 of the Inland Rules was a condition and not a contributing cause of the collision.[4]

■ The Sachem was the overtaking vessel and she was duty bound to keep out of the way of the Butler's tow. Her obligation was to keep well clear not only throughout the approach and during the actual passing, but until she was finally past and clear. The contention that the tug was at fault for failing to answer immediately the one blast signal of the Sachem, and to hold her course and speed, misconceives the rule of law applicable to the instant situation,[5] and ignores the factual situation existing at the time the one blast signal was blown. Considering the speed of the Sachem and her close proximity to the tow at the time her one blast signal was blown, and the fact that her navigators, thinking that they were well over a thousand feet from the tug, had intended to slow down and give another whistle, it would seem to be immaterial whether the tug had answered with a one blast signal or with a danger signal. Had the former been given, the Sachem would not have been excused for the resulting collision since she assumed all risks attending her attempted passage.[6] And had the tug answered with a danger signal, it would have been impossible for her to have stopped her forward momentum in less then three or four minutes. There is nothing in the complaint that the mate failed to accept the whistle signal of the steamer. He did all that was required had he in fact accepted the signal of the overtaking vessel.

We agree with the district court in the conclusion that the Sachem was wholly to blame and that the Butler was free from fault.

The decree is

Affirmed.

4. Matton Oil Transfer Corporation v. The Greene, 2 Cir., 129 F.2d 618, 620; The Syosset, 2 Cir., 71 F.2d 666, 668; The La Bretagne, 2 Cir., 179 F. 286, 288.

5. The Industry, 2 Cir., 29 F.2d 29, 30; The S. & H. No. 2, Inc., 2 Cir., 119 F.2d 666.

6. Warner Co. v. Independent Pier Co., 278 U.S. 85, 89, 49 S.Ct. 45, 73 L.Ed. 195, 197.