## HARRIS et al. v. SABINE TRANSP. CO., Inc.

## THE AUGUSTUS B. HARRIS.

No. 14913.

United States Court of Appeals
Fifth Circuit.

Feb. 27, 1953.

Rehearing Denied April 15, 1953.

538

---

Selim B. Lemle, Lemle & Kelleher, New Orleans, La., proctors for John J. Harris, d/b/a Augustus B. Harris & Son, and Globe Indemnity Co., appellants.

Edwin H. Grace, John D., M. A. & Edwin H. Grace, New Orleans, La., proctors for Sabine Transp. Co., Inc., appellee.

Before BORAH, RUSSELL and STRUM, Circuit Judges.

BORAH, Circuit Judge.

This is a case in admiralty arising out of a collision which occurred in the Gulf Intracoastal Waterway at about 8:00 p. m. on the night of February 4, 1947, when the tug Admiral was in collision with and was sunk by the tow of an overtaking tug, the Augustus B. Harris.

Sabine Transportation Company, Inc., the owner of the Admiral, filed a libel against the tug Augustus B. Harris in the United States District Court for the Eastern District of Louisiana, following which John J. Harris, doing business as Augustus B. Harris & Son, filed his claim as owner of the tug Augustus B. Harris and executed a release bond with Globe Indemnity Company as surety. The cause came on for hearing and after consideration of the pleadings and proofs the District Court made appropriate findings and entered its final decree holding the Harris solely at fault for the collision and fixing libelant's damages in the amount of $21,210.59, with interest and costs. From this final decree the claimant and surety have appealed.

The errors assigned relate principally to the fact findings of the district court and appellants insist that since these findings were based solely on deposition testimony the hearing on appeal is *de novo* and

we should make such decree as ought to have been made. This we shall do.

The collision occurred in a straight reach of the Intracoastal Waterway at a point approximately 232 miles west of the locks at Harvey, Louisiana. The waterway at and near the point of collision runs approximately east and west and has a channel width of 125 feet and a depth of 12 feet. Some 600 to 700 feet west of the point of collision, and approximately at milepost 232, the waterway bends gradually to the south. On the evening of the day in question, the Admiral, a 160 horsepower diesel tug, was proceeding west on the waterway at a speed of about 5 miles per hour over the ground pushing in the order named the lead barge STCO No. 109, 150 feet long, 37 foot beam, and the barge STCO No. 121, 137 feet long, 40 foot beam, which were loaded with crude oil. The night was clear and moonlit, the wind north, and a strong following tide was running 2½ to 3 miles per hour in a westerly direction. The barges had a loaded freeboard of 13 inches and the length of the entire flotilla was 334.8 feet. Prior to the collision, Elfrey Bell, a deckhand, was in the pilot house at the wheel of the Admiral and the master and the one other crew member were below asleep. On that same evening the Harris, towing astern on a fifteen foot hawser and bridle, and in the order named, the light barges RBC No. 1, 175 feet long, 40 foot beam; D-70, 180 feet long, 36 foot beam; and Harris No. 6, 150 feet long, 35 foot beam, was proceeding west overtaking the Admiral. The Harris had been moving at or near her full speed of 7 to 8 miles per hour but upon approaching milepost 231 she was slowed to half speed, thereby reducing her speed over the ground to 5 or 5½ miles per hour. Upon reducing speed, the Harris moved her tow close to the right or north bank to allow the overtaking towboat White Castle to pass on her port side. It was at this time that Adams, the master of the Harris, first observed the Admiral about a mile ahead near the north bank.

After the White Castle had cleared the Harris, Adams ordered that the engine of the Harris be again placed at full speed ahead. Shortly thereafter Crampes, the Harris' engineer, came on deck and saw the Admiral and her tow parallel to and near the north bank and observed the White Castle as she passed the Admiral's flotilla. At this time the Harris was between one-quarter mile and one-half mile behind the Admiral and the latter vessel was then about midway between mileposts 231 and 232. The White Castle had previously exchanged passing signals with the Admiral and after negotiating the passage without incident the Admiral moved over to the middle of the channel. She was navigating there and was approaching the bend which begins near milepost 232 when her helmsman, Bell, first became aware that his tug and tow were being overhauled by the Harris. Bell immediately directed his vessel's course to starboard to get out of the middle of the channel and in this maneuver came over too far and the lead barge struck the right bank. The flotilla's forward motion was stopped and the wheel of the Admiral was immediately put hard over left to keep her stern from swinging to port. A danger signal of four blasts was blown shortly thereafter and the engine speed was increased to the maximum to hold the Admiral in the proper channel. The Harris prior to these occurrences having reduced her speed to half speed continued ahead and in attempting to pass, the forward starboard corner of her lead barge struck the after starboard quarter of the Admiral. The barge slid over the stern of the Admiral and rode up over the top of the engineroom house, sinking the tug which went down stern first almost immediately. The 175 foot lead barge came to rest with her bow on the south bank and the stern of the Admiral was submerged thereunder amidship.

It is immaterial here and we need not and do not decide whether the Inland Rules or the Western River Rules are controlling for in either instance the rule places the burden on the overtaking vessel to keep out of the way of the overtaken vessel.[1] The Harris under either rule was required to blow a two blast signal prior to attempting to pass the Admiral to port and the Admiral, if she did not think it safe for the Harris to pass at that point, was required to signify the same immediately by giving several short and rapid blasts of the whistle, not less than four.[2] Accordingly, our inquiry is whether the rules were so violated by either vessel as to fasten statutory fault upon the offender and subject her to the burden of showing not merely that such fault might not have been one of the causes of the collision, or that it probably was not, but that it could not have been. The Pennsylvania, 19 Wall. 125, 86 U.S. 125, 22 L.Ed. 148; Coyle Lines, Inc. v. United States, 5 Cir., 195 F. 2d 737. However, it is to be recognized that neither vessel is to be condemned for fault which was remote and could not have contributed to the collision. Socony-Vacuum Oil Co., Inc. v. Smith, 5 Cir., 179 F.2d 672.

The testimony of the crews of the two vessels respecting the exchange of whistle signals is in irreconcilable conflict. In our view, the question as to whether proper whistle signals were exchanged is important only if the failure to give the signal required by law could have been a contributing cause of the disaster. We think it plain that the Admiral was not misled and further, that she did not deceive the Harris, for as soon as her helmsman became aware of the Harris' presence, he endeavored to facilitate the passing by steering his flotilla from mid-channel toward the starboard side of the fairway. Nor did the Admiral thereafter embarrass the overtaking vessel by failing to blow

1. Inland Rules, 33 U.S.C.A. § 209, Art. 24; Western River Rules, 33 U.S.C.A. § 347, Rule 22.

2. Inland Rules, 33 U.S.C.A. § 203, Art. 18, Rule VIII; Pilot Rule VIII for Western Rivers, established by the Board of United States Supervising Inspectors, Steamboat Inspection Service under the authority of R.S. 4412, 46 U.S.C.A. § 381.

a danger signal immediately after her lead barge struck the bank, for we are in no doubt that the collision would nevertheless have occurred as the Harris was then attempting to pass, was not in position to do so, and could not have stopped her tow in any event.

■■ In the narrow channel where the collision occurred the Admiral was required to keep to the starboard side of the center of the fairway if it was safe and practicable for her to do so. She is not to be condemned for a change of course which was consistent with this obligation. Her fault, if any, in striking the bank assumes importance only if she actually blocked the channel. The Admiral was struck and sunk in mid-channel, the same relative position she had occupied throughout the period in question and there was at all times available to the Harris sufficient free channel for her to have passed in safety had she been prudently navigated. The most that can be said on this record is that the Harris has merely raised a doubt as to the fault of the Admiral and her contribution to the injury. In the absence of clear and convincing evidence, this doubt should be resolved in favor of the Admiral, where, as here, the fault of the Harris was obvious and inexcusable. Socony-Vacuum Oil Co., Inc. v. Smith, supra.

The Harris did not comply with the rule of the road which requires that every vessel overtaking any other vessel shall keep out of the way of the overtaken vessel and she is to be excused only on a showing not merely that her fault might not have been one of the causes of the collision but that it could not have been. The Pennsylvania, supra. Such a showing has not been made. There is evidence in this record which fully supports the conclusion that the Harris was rapidly overhauling the Admiral; was near the north bank or in mid-channel and possibly as close as 500 feet astern of the overtaken tug and tow when she began her attempted passage and that it was impossible at that time for the overtaking vessel to have passed. This testimony is most persuasive for it is not reasonable to assume that with a strong following tide underfoot the Harris could have accomplished this maneuver in the limited time and space available to her. The physical facts show that the lead barge of the Harris' tow struck the starboard after quarter of the Admiral and it is obvious that the collision could not have occurred in this manner if the lead barge was not at the moment of impact moving from the starboard side of mid-channel to port. The Harris was required to keep her tow under control and straight behind her. The R. J. Moran, 2 Cir., 299 F. 500; The Ashbourne, 2 Cir., 181 F. 815. This she did not do. We think the Harris' failure to keep well clear of the Admiral's tow not only throughout the approach but during the actual passing was the sole and direct cause of the collision. The Harris should have slowed down and kept at a safe distance, whipped her tow in line, and waited until the Admiral had completed her maneuver of lining up her tow parallel with the right hand bank, before attempting to pass. Charles Warner Co. v. Independent Pier Co., 278 U.S. 85, 49 S.Ct. 45, 73 L.Ed. 195; Socony-Vacuum Oil Co., Inc. v. Smith, supra. Had these precautions been taken, the collision doubtlessly would not have occurred. The Admiral was not responsible for the Harris' maneuver and had the right to assume that the Harris would be navigated with due care. We agree with the District Court that the Harris was wholly to blame and that the Admiral was free from fault.

■ Appellants concede, in the event of a holding that the Harris is solely at fault, that the quantum of damages fixed by the court below is correct except for the allowance of interest which they claim should be withheld because of the inordinate delay in bringing the case to trial. We think it plain from this record that the delay complained of was not attributable to the appellee and that the District Court rightfully followed the general rule in allowing interest from the date of the collision. Managua Nav. Co. v. Aktieselskabet Borgestad, 5 Cir., 7 F.2d 990, 993. We find nothing in this case to justify an exception to the general rule.

The decree of the District Court is affirmed with costs.

Affirmed.