**BARTON, Libellant-Appellee**

v.

**BORIT, Respondent-Appellant**

No. 14,083

United States Court of Appeals

Third Circuit

Argued at Christiansted January 29, 1963

Decided April 30, 1963

*See, also, 316 F.2d 550*

GEORGE H. T. DUDLEY, ESQ. (DUDLEY & HOFFMAN), Charlotte Amalie, St. Thomas, Virgin Islands, *for appellant*

WARREN H. YOUNG, ESQ. (YOUNG & ISHERWOOD), Christiansted, St. Croix, Virgin Islands, *for appellee*

Before MARIS, WOODBURY,* and HASTIE, *Circuit Judges*

WOODBURY, *Circuit Judge*

This is an appeal from a judgment in a suit in admiralty wherein the District Court of the Virgin Islands awarded the libellant-appellee $25,185 ($23,000 damages, $2,185 interest) and costs, for the loss of the 40-foot catamaran "Miami Mae I," with its accessories, while it was in the custody of and being operated by the respondent-libellee under an oral bailment.

There is no serious dispute over the following facts.

The libellant-appellee, Raymond Barton, arrived at St. Croix, V.I., in the summer of 1960 on board the "Miami Mae I," which had been built under his personal supervision in Portugal the year before at the cost of $12,500 for the hull, rigging and sails and which he, with one paid hand, had sailed across the Atlantic. With the intention of engaging in the Buck Island excursion trip business, Barton began conversion of the craft from closed cabin to open cockpit in order to increase its passenger carrying capacity from six to eighteen. While these alterations were being made Barton moved the boat from Christiansted Harbor to Emerald Bay on the northeast shore of St. Croix, hard by the then residence of his new-found friend, the respondent Borit, and asked Borit to "look after" the boat while he, Barton, made a trip to continental United States. In return for this favor Barton told Borit, who was an experienced sailor, that he might use the boat, but the evidence is contradictory as to the scope of the authoriza-

* By Designation.

tion. Borit testified that the scope of his authority to use was unlimited. Barton gave various versions, the general tenor being that Borit might use the boat to sail on weekends in the waters around St. Croix as far as the outer reef off Buck Island.

Borit used the "Miami Mae I" four or five times for single handed afternoon sails close to St. Croix and Buck Island and then decided to sail the boat about fifty miles across open sea to Roadtown on the Island of Tortola, one of the British Virgin Islands, to inspect two of his own boats in dry dock at a boat yard there. He said he hoped to pick up one of his own boats and sail it back to St. Croix leaving the catamaran to have its bottom cleaned and painted as a surprise gift to Barton. In pursuance of this plan Borit left St. Croix on October 18, 1960, about 2 P.M. He took no crew but was accompanied by a woman passenger who was not a sailor.

Clearly Borit could not have made Tortola by nightfall. He said it was not his intention to do so but to anchor for the night off Peter Island, lying east and a little north of the easterly end of the Island of St. John. For various reasons Borit fell behind his schedule, and about 9 P.M. he decided not to risk further sailing in the dark but to anchor for the night in the lee of a small uninhabited islet just to the east of the easterly end of St. John called Flanagan Island. Borit first tried to anchor on the west side of Flanagan Island but was prevented from doing so by a rolling sea and then he tried to anchor off the southwest corner of the island where he claimed to have a skin diver's knowledge of the waters. This attempt also proved unsuccessful and the "Miami Mae I" stuck on a rock. Borit tried to get the boat off but failed and the next morning he and his passenger swam ashore. Two days later they were rescued by the Coast Guard. The "Miami Mae I" was a total loss.

■ There is evidence that before the ill-fated voyage the "Miami Mae I" had been damaged to some extent by being blown ashore by high winds on the fringe of a hurricane and that she was in a somewhat deteriorated condition from neglect. And it is undisputed that in the process of reconstruction from a cabin to a cockpit vessel her running lights had been removed. She had no dingy or life jackets on board and there is evidence that her 80′ anchor rope was insufficient and that her outboard motor was inoperable. While the boat might have been seaworthy for daytime sailing around St. Croix as far as Buck Island, there can be no doubt that she could be found inadequate in structure and equipment for an open sea voyage to Tortola. Nor can there be doubt that the evidence supports a conclusion that Borit was negligent in starting the voyage he had in mind so late in the day without a crew on a boat as ill-fitted for the voyage and that he was negligent in attempting to anchor where he did instead of seeking a more sheltered anchorage nearby in Hurricane Hole. In short, the evidence clearly supports the district court's conclusion No. 1: "That the unauthorized use and the negligent handling of the 'Miami Mae I' by the respondent Borit on October 18, 1960, was the direct and proximate cause of its destruction." This finding is accordingly affirmed.

The serious question on this appeal is the adequacy of the district court's findings on the issue of damages.

The only subsidiary findings underlying the district court's award of damages in the amount of $23,000 are the following: 1) that the market for the sale of catamarans is "specialized," 2) that Barton paid $12,500 for the hull and sails in Portugal in 1959, 3) that he spent seven months supervising its construction, 4) that the cost of shipping the boat to the Virgin Islands would have been over $3,000, 5) that the estimated life of the boat is between 15 and 20

years, 6) that reproduction cost of the boat in St. Croix, V.I., would be about $23,000 for the boat and about $500 for the sails, and 7) that the reasonable value of the lost equipment was $2,000. We do not consider these findings adequate to support the court's ultimate conclusion.

■ To apply the maxim *restitutio in integrum* applicable in cases of this kind, inquiry must be made into the fair market value of the boat in the condition in which it was just before the loss. And the best evidence of fair market value is the price at which comparable property changes hands at about the time of loss in arm's length transactions between willing buyers and willing sellers. See Standard Oil Co. v. Southern Pacific Co., 268 U.S. 146, 155–56 (1925), in which the Court said:

> "In case of total loss of a vessel, the measure of damages is its market value, if it has a market value, at the time of destruction. *The Baltimore*, 8 Wall. 377, 385. When there is no market value such as is established by contemporaneous sales of like property in the way of ordinary business, as in the case of merchandise bought and sold in the market, other evidence is resorted to. The value of the vessel lost properly my be taken to be the sum which, considering all the circumstances, probably could have been obtained for her on the date of collision; that is, the sum that in all probability would result from fair negotiations between an owner willing to sell and a purchaser desiring to buy. Brooks-Scanlon Corporation v. United States, 265 U.S. 106, 123. And by numerous decisions of this Court it is firmly established that the cost of reproduction as of the date of valuation constitutes evidence properly to be considered in the ascertainment of value. [citations omitted] It is to be borne in mind that value is the thing to be found and that neither cost of reproduction new, nor that less depreciation, is the measure or sole guide. The ascertainment of value is not controlled by artificial rules. It is not a matter of formulas, but there must be a reasonable judgment having its basis in a proper consideration of all relevant facts. Minnesota Rate Cases, 230 U.S. 352, 434."

■■ Therefore in cases like this the first search is for contemporaneous sales of comparable vessels. This, how-

ever, does not mean as counsel and the court below seem to think that search is limited to the immediate area where the vessel to be valued was lost or the port where it last lay. Nor does it mean that the search is necessarily limited to the nearest available market, although when a distant market is chosen allowance must be made for the cost of moving the vessel to its market and fitting it for sale thereon.[1] Thus when there is evidence of a number of sales on an open market of similar vessels the prices paid would set the limits of valuation to which the court must adhere, and resort to other indicia of value is not warranted. Texas Company v. R. O'Brien & Co., 242 F.2d 526, 527 (C.A. 1, 1957).

The evidence of a market for catamarans like the "Miami Mae I" is far from satisfactory, for that matter was not thoroughly explored by counsel at the trial. About all that appears is that the catamaran type of boat for use as a yacht is relatively new and that catamaran-type yachts are not standardized and are perhaps still somewhat experimental and hence have appeal for only a few yachtsmen. That is what we suppose the court below meant when it found that the market for such boats was "specialized." The question, however, is not whether the market is "specialized" but whether sales on the catamaran market at about the time of the loss were numerous enough to afford reliable evidence of the value of such vessels. We have no finding on this basic issue. Indeed, about all we can learn from the record about the relevant market is that a catamaran comparable to the "Miami Mae I" in use at the time in the Buck Island excursion business was offered for sale in Christiansted Harbor for $16,500 but had no takers. While evidence of offers for

[1] See United States v. Toronto etc. Navigation Co., 338 U.S. 396, 405 (1949), in which the Court indicated that a Florida market for use in the Cuba trade was not necessarily irrelevant in valuing a railroad car ferryboat located on the Great Lakes where there was no market for it, the trade in which it had been employed having become obsolete.

sale is not necessarily irrelevant it is not the equivalent of evidence of sales. Unaccepted offers without explanation may mean lack of market or too high an asking price, in which event the evidence would put a ceiling on the libellant's allowable recovery. There is no resolution of the meaning of this evidence or any testimony in the record on which to resolve it. The case must go back for a definite finding, based on additional evidence if thought necessary, as to whether or not there was a sufficient market for catamarans like the "Miami Mae I" to establish a reliable basis for the valuation of such vessels.

█ Only if it should appear that there was no market for boats similar to the "Miami Mae I," or that there were so few sales of like boats that it could not be predicted with any assurance that the prices paid would be repeated in a postulated sale of the boat in question, may resort be had to other relevant indicia of value such as replacement cost appropriately depreciated. United States v. Eastern S.S. Lines, 171 F.2d 589 (C.A. 1, 1948), and cases cited. But here again we have no adequate findings.

Apparently the court below in some way based its ultimate award of $23,000 for the boat, its sails and its equipment upon its subsidiary finding of a local reproduction cost of $23,000 for the boat and $500 for the sails, and its finding that the lost equipment was worth $2,000. But there is no disclosure of how the court arrived at its ultimate figure. Having found a reproduction cost for the boat of $23,000 and a value for its sails and equipment of $2,500 and then having made a gross award of $23,000, it would appear that the court must have depreciated the reproduction cost of the boat by $2,500. But that figure does not fit the finding of a 15 to 20 year life expectancy for the boat.[2] Moreover, there is no indication that any

[2] Straight line depreciation on a reproduction cost of $23,000 for a year and a half at 5% based on 20 years life expectancy comes to $1,725 and at 6.7% based on 15 years life expectancy comes to $2,311.50.

allowance was made for the condition of the boat at the time of its loss, that is to say, for its deterioration from neglect, for the damage it sustained when it was blown ashore and for the fact that when it was lost it was neither a cabin nor an open cockpit boat but was in the process of conversion from one to the other. Should reproduction cost become relevant at all, the court below should make findings to show how it used that cost in arriving at a valuation for the boat.

Judgment will be entered remanding the case to the District Court for further proceedings consistent with this opinion.