**RAWLS BROTHERS CONTRACTORS, INC., Libelant,**

v.

**The UNITED STATES of America, Florida Towing Corporation, and the TUGS W. E. COPPEDGE and S. H. COPPEDGE and their engines, tackle, apparel, furniture and other appurtenances, Respondents.**

No. 63–9–Adm.–J.

United States District Court
M. D. Florida,
Jacksonville Division.

Jan. 12, 1966.

Bedell, Bedell, Dittmar & Smith, Jacksonville, Fla., for libelant.

Edward F. Boardman, U. S. Atty., Jacksonville, Fla., and Allen van Emmerick, Atty., Admiralty & Shipping Section, Dept. of Justice, Washington, D. C., for respondent United States.

Ulmer, Murchison, Kent, Ashby & Ball, Jacksonville, Fla., for respondents Florida Towing Corp. and claimant Wayland T. Coppedge & Son, Corp. and their surety Firemen's Fund Insurance Co.

SIMPSON, Chief Judge.

On August 6, 1962, at the shipyard leased and operated by libelant Rawls Brothers Contractors, Inc., in Jacksonville, Florida, the USS TRAVERSE COUNTY left her mooring under her own power, with assistance from the respondent tugs W. E. COPPEDGE and S. H. COPPEDGE and under the direction of tugmaster and docking-pilot Joseph N. Durst, an employee of claimant-respondent Florida Towing Corporation. In the course of the undocking operation the TRAVERSE COUNTY collided with a dolphin that was a part of a drydock installation in the yard, and this proceeding resulted.

Numerous exceptions were filed by the parties challenging the legal sufficiency of various allegations in the pleadings of opposing parties. Ruling was reserved on those exceptions. Each such exception is now overruled so that the evidence introduced in support of each averment may be given such effect as in law it is entitled to. The case was tried beginning March 9, 1964, on the basic issue of fault, on the issues of the damages suffered by libelant and the United States as a result of the collision and on factual issues affecting the application in this case of the "pilotage clause" and "warranty clause" that were published by Florida Towing in a pamphlet containing the schedule of rates for tug services generally charged by Florida Towing at the time of the collision. At the conclusion of the trial, the Court announced a general finding that the collision resulted from the negligence of Florida Towing Corporation employees, including Joseph N. Durst, who participated in the undocking operation. These findings of fact and conclusions of law dispose of the issues consistently with those announced general findings.

FINDINGS OF FACT

1. Rawls Brothers Contractors, Inc., libelant, operates a shipyard on the north bank of the St. Johns River in Jacksonville, Florida, by the use of land and appurtenances (including the subject dolphin) leased in 1960 from Commodores Point Terminal Corporation, which has appeared herein, has agreed to be bound by the Court's disposition of the matters

in litigation, and has consented of record to Rawls' prosecution of the claim herein made and to collection by Rawls of any amount found to be due on account of damage to the dolphin. The dolphin was constructed of steel bearing piles driven to bedrock beneath the river as support for a 70-ton concrete cap to which was attached a mooring device for a section of the 18,000-ton steel drydock AFDM–9, which was leased by Rawls from the United States Navy.

2. The United States of America, respondent, owns and its Navy Department operates the public vessel USS TRAVERSE COUNTY (LST–1160), which, having completed repairs at libelant's shipyard, was moored alongside libelant's pier No. 3 in the early morning hours of August 6, 1962, and was awaiting tug assistance into the stream of the St. Johns River.

3. The contract of repair between Rawls and the United States provided in part:

> "After completion of all work, the contractor will furnish tug and pilot services for movement of vessel to the area adjacent to his repair facilities for acceptance of tow and/or for vessel to proceed under its own power."

On the afternoon of August 3, 1962, in order to furnish the undocking services contemplated by the contract, dockmaster Noel Peppers of Rawls had telephoned Wayland T. Coppedge, President of Florida Towing Corporation, and had orally requested that Florida Towing send two tugs to assist the TRAVERSE COUNTY in sailing at 8:00 o'clock a. m. on August 6. Mr. Coppedge stated to Mr. Peppers that the tugs would be there. That was the extent of the conversation.

4. The Diesel tug W. E. COPPEDGE, owned by claimant Wayland T. Coppedge & Son Corporation, and the steam tug S. H. COPPEDGE, owned by respondent Florida Towing Corporation, were provided by Florida Towing Corporation at about 8:00 o'clock of the morning of August 6, 1962, to assist the TRAVERSE COUNTY from the pier and into the stream of the St. Johns River. The tugs were manned by employees of Florida Towing Corporation and were under the direction of that respondent's employee Joseph N. Durst, master of the S. H. COPPEDGE, whose duties as an experienced docking pilot included that of coordinating the operations of the assisting tugs with the operation of the vessel being assisted, in this case the TRAVERSE COUNTY.

5. Captain Durst reported aboard the TRAVERSE COUNTY at about 8:00 a. m. on August 6, 1962, and proceeded to the bridge, the station customarily used by him in docking or undocking vessels under their own power and with the assistance of tugs. He was soon joined on the bridge by the TRAVERSE COUNTY's commanding officer, Captain Holmes, Lt. Commander USN, who advised Captain Durst of the vessel's general handling characteristics. Durst was familiar with the handling characteristics of vessels of the TRAVERSE COUNTY's class not only from his previous experience with other such vessels but also from his experience in undocking the TRAVERSE COUNTY at libelant's shipyard for sea trials a week before the day of the collision. Also on the bridge were the Executive Officer, the special sea detail Officer of the Deck and Junior Officer of the Deck, bar pilot Philips, and various enlisted men assigned as lookouts, navigational assistants, and log keepers. The day was fair, with little or no wind, and about a two-knot tidal current ebbing downriver, pressing against TRAVERSE COUNTY's port side.

6. As is customary at special sea detail, TRAVERSE COUNTY's engines were on direct pilot house control, running at a constant 260 rotations of the propeller shafts per minute. TRAVERSE COUNTY has two propeller shafts, each separately controllable as to shaft rotations, and each equipped with separately controllable variable pitch propellers. The speed and direction of the ship is controlled by adjusting the amount and direction of the pitch of the

propeller blades. This is done by actuating controls in the pilot house, directly below the conning station in use on this occasion, according to engine orders received from the conning officer. Helm orders are executed on a typical ship's wheel. The pilot house on this occasion was manned by a helmsman, a lee helmsman who operated the direct pilot house engine control console, and an engine order telegraph operator, who logged the engine orders in a bell book, and paralleled the engine orders executed on the console by repeating them on a standard naval engine order telegraph, to advise the engine room of engine orders in case of emergency.

7. Shortly before 8:30 a. m., Captain Holmes had all lines readied to be cast off, and gave pilot Durst the conn. At 8:34 pilot Durst ordered all lines cast off, and backed TRAVERSE COUNTY out of the slip. The W. E. COPPEDGE "caught," a term denoting a tug's coming up next to a ship and making fast a line to her, TRAVERSE COUNTY's starboard quarter, and assisted the undocking by holding the stern up against the ebb tide as TRAVERSE COUNTY backed across the stream and its current. As TRAVERSE COUNTY's bow cleared the pier, the S. H. COPPEDGE nosed against her starboard bow and likewise held her up against the current, but did not put a line aboard. It is customary for assisting tugs to make a line fast to the assisted vessel, and to do so with or without the orders of the docking pilot.

8. Acting thus together, TRAVERSE COUNTY and her tugs backed across the St. Johns River, toward another shipyard across from libelant's. Noting that TRAVERSE COUNTY was closing on ships moored there, Captain Holmes advised pilot Durst that TRAVERSE COUNTY, like others of her class, was slow in reacting go an ahead bell when she had sternway on. Whereupon pilot Durst gave ahead bells, arresting TRAVERSE COUNTY's sternway at about 100 feet from the ships astern, and commencing a swing of TRAVERSE COUNTY's bow downstream, toward the sea. Previous to arresting sternway, pilot Durst had ordered the S. H. COPPEDGE to shift from the starboard to the port bow, to assist in heading TRAVERSE COUNTY downstream. Again, the S. H. COPPEDGE did not make fast a line to TRAVERSE COUNTY.

9. The S. H. COPPEDGE pushed TRAVERSE COUNTY's bow to starboard under "two jacks," about two-thirds speed, pursuant to pilot Durst's orders. The S. H. COPPEDGE ceased pushing at or very little short of midchannel, as TRAVERSE COUNTY was headed nearly downstream on or parallel to the channel axis. But under the momentum of S. H. COPPEDGE's push, TRAVERSE COUNTY swung unchecked across the axis, and toward the south bank. At this point she had little or no headway on, and Captain Holmes advised pilot Durst that, when light as she was, her bow swung rapidly once started and that strong engine orders were required to check the swing. Pilot Durst acknowledged this, and sent the W. E. COPPEDGE from the starboard quarter to the starboard bow, to push against and arrest the swing. The swing was stopped with TRAVERSE COUNTY about 45° from the channel axis, and her bow about 200 feet from the south bank. Although there was ample time to do so, the W. E. COPPEDGE did not put a line up on TRAVERSE COUNTY's forecastle. Under twisting engines and with the W. E. COPPEDGE pushing full ahead (although pilot Durst ordered two jacks), the TRAVERSE COUNTY was started on a swing back to the channel axis, again without headway, and perhaps under some sternway. About 50 or 100 feet from midchannel, the W. E. COPPEDGE throttled down to one jack, about one-third speed, on command by pilot Durst, and stopped pushing, according to her captain, on or just before reaching midchannel. Captain Holmes, however, observed the W. E. COPPEDGE to fall back and then surge ahead again, giving an extra push apparently not called for by pilot Durst, which push continued be-

yond midchannel for about 30 seconds. TRAVERSE COUNTY's Junior Officer of the Deck also noted the push beyond midchannel, but not the separation preceding it. I find that the W. E. COPPEDGE did push beyond midchannel, without orders to do so.

10. On both sectors of the swing, to the south first, and then toward the north, the bow swung more rapidly than the stern. TRAVERSE COUNTY never settled on a heading downchannel, but swung continually in one direction or the other. Almost all of the ship's motion during these swings was lateral, there being little or no headway or sternway on her at any time. This lateral slide or crabbing is accounted for by the use of the tugs and TRAVERSE COUNTY's engines.

11. As the ship swung northward, back toward libelant's shipyard, her heading changing to the left and the whole ship crabbing northward, her impending extremity became apparent. She crossed midchannel, swinging toward libelant's shipyard, and particularly a tanker in drydock there. Pilot Durst ordered a twisting movement of the engines—two-thirds ahead on the port shaft, two-thirds back on the starboard, in an attempt to check the swing and extricate TRAVERSE COUNTY from the developing situation.

12. Captain Holmes deemed such orders inadequate to the occasion, and immediately ordered all back full, thereby assuming the conn, at about a minute and a half before collision. TRAVERSE COUNTY responds well to such bells, and shortly began to back down. As soon as some sternway was on, and collision with the tanker in drydock averted, Captain Holmes stopped both engines, seeing that collision with the dolphin was unavoidable, and wishing to have as little motion on TRAVERSE COUNTY as possible at the time of impact.

13. At about 8:45 a. m., 11 minutes after getting under way, the TRAVERSE COUNTY struck libelant's leased dolphin, bounced off, and left the entire dolphin structure twisted or laid over and displaced in an upstream direction. The steel bearing piles on which the concrete cap was supported were so bent and weakened by the impact that, on August 11, 1962, the wash from the propellers of a nearby tug caused the structure to topple over. The corner of the dolphin cut a small gash in TRAVERSE COUNTY's plating.

### Findings as to Fault

14. While in active charge of docking pilot Joseph N. Durst, the TRAVERSE COUNTY was permitted to swing rapidly by the bow from north to south past midchannel to a position perilously near to the south bank and then to swing northward across midchannel again on a collision course with a tanker drydocked in libelant's yard. It was from that dangerous position that Captain Holmes was attempting to extricate the TRAVERSE COUNTY when she struck the dolphin. Joseph N. Durst should have maintained more effective control of the TRAVERSE COUNTY by means of engine and helm orders to the personnel of that vessel; he should have ordered the S. H. COPPEDGE to cease pushing against TRAVERSE COUNTY's port bow before the vessel reached midchannel in her swing toward the south bank; he should have, by appropriate orders to the S. H. COPPEDGE, assured that the tug made a line fast to TRAVERSE COUNTY's port bow, stood by or otherwise assisted in preventing such extraordinary swinging back and forth across the channel; he should have ordered the W. E. COPPEDGE to cease pushing against TRAVERSE COUNTY's starboard bow before the vessel approached midchannel in the course of her swing back toward the north bank; and he should have, by appropriate orders to that tug, assured that W. E. COPPEDGE made a line fast to TRAVERSE COUNTY's starboard bow so as to assist, if necessary, in arresting the vessel's swing. In these respects Joseph N. Durst was guilty of negligence contributing to the collision.

15. The S. H. COPPEDGE was guilty of fault contributing to the collision in

that she failed to make a line fast to TRAVERSE COUNTY's port bow, although she had standing orders to do so, while turning the vessel in the river and into a downstream position; in failing to stand by near TRAVERSE COUNTY's port bow or between the vessel and the north bank, where the tug might have been able to prevent the continued swing toward libelant's shipyard; and in failing to go in a direct route to TRAVERSE COUNTY's port bow as she swung northward across midchannel and toward libelant's yard.

16. The W. E. COPPEDGE was guilty of fault contributing to the collision in that, in pushing TRAVERSE COUNTY's starboard bow back toward midchannel from its position near the south bank, the W. E. COPPEDGE disobeyed Durst's order to push at two-thirds speed and pushed instead at full speed; she disobeyed Durst's order to back away when that order was given near midchannel and continued to push beyond midchannel; and she failed to make a line fast to TRAVERSE COUNTY's starboard bow, although she had standing orders to do so.

17. The United States Navy personnel of the TRAVERSE COUNTY were not guilty of fault contributing to the collision. Nor was Rawls shown to be guilty of negligence in the respects charged by the United States in its answer or in any other respect.

### Findings as to Damages

18. Libelant's leased dolphin was 11 years old at the time it was struck, having been designed and built in 1951 as part of the installation of the Navy drydock AFDM-9, which was originally leased by Merrill-Stevens Drydock & Repair Co., libelant's predecessor in the operation of the shipyard, and thereafter by libelant. Without such a dolphin, designed as a mooring device suitable for use when the drydock was being raised and lowered, as well as when it was stationary, the drydock was not fully serviceable. The dolphin was capable of being used independently of the drydock, as a mooring

for vessels, and in fact it was used for that purpose for a period of two years while the drydock itself was in Mobile, Alabama. After it was struck by the TRAVERSE COUNTY but before its concrete cap fell to the bed of the river, the damaged dolphin was surveyed by representatives of the interested parties, who agreed on specifications for repairs and renewals. They agreed that 12 new steel H-beam bearing piles should be driven to bedrock to replace those which were damaged and that the old concrete cap should be disposed of and a new cap poured atop the new piles (or, at the election of the contractor and in a manner approved by the parties, the old cap might be salvaged and reinstalled on the new steel bearing piles). The incident of August 11, in which the dolphin structure completely collapsed, did not make the repairs and renewals more difficult or more costly. On August 15, 1962, after four prospective contractors had failed or refused to submit bids, the interested parties agreed that the reasonable cost of performing the work was $52,836.00 and agreed that Rawls should perform it. While the repairs and renewals specified were necessary to restore an essential function to the drydock installation as a whole, their effect was to replace eleven-year-old bearing piles with new ones. Between 1951, when the steel piles were installed, and 1962, when they were damaged by the collision, the webs and flanges of the piles had been reduced in thickness by corrosion near the riverbed from approximately .5 inch to approximately .356 inch. The utility of the dolphin for its designed purpose (and for secondary uses to which it was devoted from time to time) had not been affected by corrosion at the time the dolphin was struck. However, libelant's expert witness testified without contradiction that, had such corrosion been permitted to continue unchecked through 1971, it would have by then so reduced the thickness of the piles near the riverbed that the dolphin could not thereafter withstand the stresses it was required to withstand in the operation of the dry-

dock. The evidence shows also that an effective and relatively inexpensive cathodic protection device, designed to arrest corrosion by impressing an electrical current on the structure sought to be protected, has recently been developed and successfully used to arrest steel corrosion in the waters of the St. Johns River at Jacksonville. Such a protective system, if installed on the dolphin before about 1971, would have been effective to arrest corrosion and thus to extend the useful life of the dolphin for an indefinite period of time. Libelant's expert testified that such a system could have been installed and maintained at a total annual cost, including the prorated installation cost, of $385.00. Yet, the life expectancy of the dolphin, without cathodic protection, was twenty years and the dolphin had been in use for 11 years when it was destroyed. Cathodic protection had not been installed on the dolphin before the collision, and there was no testimony that libelant or its predecessors in interest had ever planned to install such a system or that they ever considered the advisability of doing so. There is nothing in the evidence to indicate that libelant was even aware of the possibilities of such a system until two or three weeks before trial, when its counsel was discussing the case with its expert witnesses. The Court therefore finds that the reasonable cost of replacing the dolphin was $52,836.00, that the dolphin had a depreciated value at the time it was destroyed of nine-twentieths or 45 per cent of its original value and that libelant sustained damage as a result of the collision in the amount of $23,776.20 and incurred expenses incident to the survey in the amount of $534.67.

19. The TRAVERSE COUNTY was damaged as a result of striking the dolphin in the amount of $150.00.

### Findings as to the "Pilotage" and "Warranty" Clauses

20. Shortly before October 15, 1961, respondent Florida Towing Corporation printed and thereafter distributed by mailings and delivery to its customers a pamphlet containing a schedule of rates for tub service. That edition of the Florida Towing Corporation rate schedule pamphlet was similar, in many respects, to previous editions distributed in like manner in earlier years. Among the "terms and conditions" listed in the pamphlet was the following paragraph, known as a "pilotage clause":

> "When the captain of any tug furnished to or engaged in the service of assisting a vessel which is making use of her own propelling power, goes on board such vessel, or any other licensed pilot goes on board such vessel, it is understood and agreed that such tugboat captain or licensed pilot becomes the servant of the owner of the vessel assisted in respect to the giving of orders to any of the tugs furnished to or engaged in the assisting service and in respect to the handling of such vessel, and neither those furnishing the tugs and/or pilot nor the tugs, their owners, agents, charterers, operators or managers shall be liable for any damage resulting therefrom."

A pilotage clause had been part of Florida Towing Corporation's rate schedule since 1943. A so-called "warranty clause" was added in a separate paragraph immediately following the pilotage clause in the pamphlet first distributed in 1961:

> "With respect to vessels that are not owned by the person or company ordering the tugboat service, it is understood and agreed that such person or company warrants that it has authority to bind the vessel owner to all the provisions of the preceding paragraphs, and agrees to indemnify and hold us harmless, and also those furnishing the tugs and/or pilot, the tugs, their owners, agents, charterers, operators and managers, from all damages and expenses that may be sustained or incurred in the event and in consequence of such person or company not having such authority."

No other pamphlet was issued between October 1961 and August 1962, when the collision occurred, and the rates specified in the schedule contained in that pamphlet were the rates that generally were charged by Florida Towing for tug service at the time of the collision.

21. Against the United States, Florida Towing asserts in its cross-claim that the United States, through Rawls as its authorized agent, agreed that Durst should become the servant of the United States in giving orders to the two tugs and in handling the TRAVERSE COUNTY and that neither Florida Towing nor the tugs should be liable for damage resulting from orders given by Durst or from his handling of the TRAVERSE COUNTY. The Court finds that Rawls had no authority to bind the United States to the pilotage clause or to any other provisions of the rate schedule and that the United States did not otherwise agree to become bound.

22. As against libelant, Florida Towing asserts as a defense to the libel that Rawls Brothers did not have authority to bind the United States but nevertheless expressly warranted that it had such authority and, therefore, is bound to indemnify and hold harmless Florida Towing Corporation and the tugs

> "from all damages and expenses that may be sustained or incurred in the event and in consequence of such person or company not having such authority."

Florida Towing concedes, and rightly so, that the pilotage and warranty clauses cannot affect the liability of the tugs W. E. COPPEDGE and S. H. COPPEDGE for their fault committed independently of the orders of Captain Durst. Florida Towing's claim that an express warranty was made does not rest on any writing subscribed to by Rawls or any of its officers, nor upon any express oral agreement, representation or statement. Rather, Florida Towing claims in effect that, because Florida Towing had mailed out printed pamphlets containing the warranty clause, Rawls should have known that Florida Towing would re-

gard Noel Peppers' telephone calls as communicating an express warranty of Rawls' authority to bind the United States and that, because Rawls did not repudiate the warranty, Rawls is now precluded by some form of estoppel to deny that a warranty was made. Because of the following considerations, the Court finds that Rawls neither expressly nor impliedly warranted to Florida Towing Corporation that Rawls had authority to bind the United States to the provisions of the pilotage clause and, stated differently, that Rawls is not in the circumstances of this case estopped to deny that a warranty was made:

(a) Rawls had no reason to believe that Florida Towing would regard Peppers' telephone call as communicating a warranty of the existence of a wholly fictitious relationship between Rawls and the United States. The pilotage and warranty clauses had never been discussed by any representative of Florida Towing with any representative of Rawls. Florida Towing never called the warranty clause to the attention to its customers, but simply mailed out the new rate schedule in 1961, which contained the clause for the first time, just as it had mailed out all previous rate schedules that contained no such warranty clause. The warranty clause recites that the person or company ordering the tugboat service warrants that it has authority to bind the vessel owner, not simply to the pilotage clause contained in the immediately preceding paragraph, but "to all the provisions of the preceding paragraphs." Those "preceding paragraphs," to which the vessel owner is purportedly "bound" by the person ordering the tugboat service, include definitions of "docking and undocking," the statement that "the charges for such services are found in the rate schedule," a provision for payment of extra charges for the services of more than one tug, a provision for extra charges for detention of a tug, and a provision for "mutually agreed upon" charges for services not covered by the schedule. For many years before 1961 Rawls and its predecessor company or-

dered for its own account and had paid for the services of Florida Towing's tugs and tug captains. Until then, there was no warranty clause in the rate schedule pamphlet. It is unreasonable to suggest that, without the slightest comment passing between the officers of the two companies, Rawls suddenly should have apprehended that Florida Towing no longer considered that Rawls was contracting for its own account and thenceforth considered that Rawls was acting as agent for various vessel owners. Certainly there was no reason for Rawls to apprehend that Florida Towing would make such an assumption as to Rawls' authority to act for the owner when the owner was the United States Navy. Florida Towing's rates for assisting Navy vessels were not set forth in the rate schedule pamphlet at all but were covered by an oral agreement (with Merrill-Stevens and Rawls, not with the United States) that antedated by several years the first publication of the warranty clause. Nothing put Rawls in notice that the long-standing agreement as to tug service for Navy vessels should be subject to a warranty clause in a rate schedule that was not in existence when the agreement was made and which Florida Towing admits is inapplicable to the situation except as the pilotage and warranty clauses may be applicable. Had Rawls' officers carefully studied the pilotage and warranty clauses, they would have been thoroughly justified in assuming that the warranty clause was to be applicable only in cases in which the person ordering the tug service was actually doing so as agent for the vessel owner and actually considered that he was binding the vessel owner to some or "all the provisions of the preceding paragraphs."

(b) Florida Towing did not mistake Rawls for an agent of the United States, did not rely on any warranty, express or implied, and was not misled to believe that Rawls had bound the United States "to all the provisions of the preceding paragraphs." Florida Towing Corporation did not consider that the United States Navy was "bound" to all or any of the provisions of the "preceding paragraphs." Specifically, Florida Towing did not consider that the United States Navy was "bound" to pay the charges referred to in the "preceding paragraphs" or, indeed, to pay any charges at all. Coppedge testified that the rate schedule did not apply to Navy vessels because the tonnage of those vessels could not be determined as in the case of commercial vessels. Attempting to show that some of the "terms and conditions" applied in the case of Navy vessels, while others did not, Mr. Coppedge inferred in his testimony that the charge of $186.00 for services rendered the TRAVERSE COUNTY was "a special rate" that was "mutually agreed upon" pursuant to the terms of the rate schedule. But that special agreement was not made with the United States Navy or with any purported agent of the Navy. The agreement was made with Merrill-Stevens, and it was made long before Florida Towing published its October 1961 pamphlet and attempted to provide itself with a reason for regarding Rawls as an agent of the vessel owners. Florida Towing was under no misconception as to who had contracted for the tug service. The evidence shows that the bill for the services rendered on August 6, 1962, was not rendered to the TRAVERSE COUNTY and its owner (as was the similar invoice of Carroll Towing Company) but was rendered to Rawls Brothers. In fact, Florida Towing's invoices for almost identical services (including Durst's services) rendered the Navy vessel were addressed and sent to and were paid by Rawls Brothers for four occasions in May, June and July 1962. Florida Towing had a contract with Rawls Brothers to render tug service to the TRAVERSE COUNTY and never considered that it had a contract for that purpose with the vessel owner or with anyone else.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction of the subject matter of this suit in admiralty and has jurisdiction of the parties, including the United States under the Public Vessels Act, Title 46 U.S.C.

§ 781, et seq., and the not inconsistent provisions of the Suits in Admiralty Act, Title 46 U.S.C. § 741 et seq.

2. The fact that the TRAVERSE COUNTY struck libelant's leased dolphin, a stationary object, raises a presumption of fault operating against Durst, the two tugs, and the master and personnel of the TRAVERSE COUNTY, who were the "parties participating in the management of the vessel at all times when negligent management was a factor in causing the collision." Patterson Oil Terminals, Inc. v. The Port Covington (E.D.Pa.1952), 109 F.Supp. 953, 955, aff'd (3d Cir. 1953), 205 F.2d 694. See also Pennsylvania R. R. Co. v. The S. S. Beatrice (S.D.N.Y.1958), 161 F.Supp. 136, 147, and cases cited therein, aff'd (2d Cir. 1960), 275 F.2d 209. Of the participating parties only the United States Navy personnel are shown by the evidence to have been free from negligence. The evidence affirmatively shows, as the Court has found, that Durst and the tugs were guilty of fault producing the collision. Florida Towing Corporation, which as Durst's employer is responsible for the consequence of his negligence committed in carrying out the duties of his employment, and the respondent tugs W. E. COPPEDGE and S. H. COPPEDGE are jointly and severally liable to Rawls Brothers Contractors, Inc., and to the United States for the damages suffered by each. A bond in lieu of arrest of the tugs having been filed by Florida Towing Corporation and Wayland T. Coppedge & Son Corporation, as claimants of the S. H. COPPEDGE and of the W. E. COPPEDGE, respectively, and a surety, the decree will be entered against those claimants and their surety in the amount of the joint and several liability of each tug to Rawls and to the United States. It is appropriate that the decree provide that, as between the different parties and interests in fault, the burden of the damage be apportioned equally. Pennsylvania R. R. Co. v. The S. S. Beatrice (2d Cir. 1960), 275 F.2d 209.

3. Since Rawls dealt for its own account and not as agent for the Government in dealing with Florida Towing on the subject of the tug and docking pilot services to be provided the TRAVERSE COUNTY, the pilotage clause relied on by Florida Towing never became operative between Florida Towing and the owner of the vessel assisted. See States Marine Corp. of Delaware v. Victory Carriers, Inc. (9th Cir. 1959), 272 F.2d 463. As to the putative effect of the warranty clause against Rawls, Florida Towing concedes in argument and the law confirms that, in the circumstances shown by the evidence, Rawls did not impliedly warrant to bind the United States to the pilotage clause. See The West Eldara (2d Cir. 1939), 104 F. 2d 670; People of the State of California v. The Jules Fribourg (N.D.Cal.1956), 140 F.Supp. 333. Furthermore, Rawls made no express warranty that it possessed such authority; Rawls had no reason to anticipate that Florida Towing would mistakenly assume it had such authority; and Florida Towing did not, in fact, mistake Rawls for an agent of the United States or otherwise rely on the alleged warranty, as in States Marine Corp. of Delaware v. Victory Carriers, Inc. (9th Cir. 1959), 272 F.2d 463. Neither did Rawls conduct itself in such a way as to be precluded and estopped from denying that a fictitious relationship existed between it and the United States. See 31 C.J.S. Estoppel § 74, at pages 445–452.

4. In the absence of evidence that the dolphin had a market value at the time of its destruction, the Court holds that the measure of libelant's damage is the cost of reproduction of the dolphin on August 6, 1962, less a reasonable sum for depreciation. This is the rule with respect to the complete loss of personal property in general (Jacksonville, T. & K. W. Ry. Co. v. Peninsular Land, Transp. & Mfg. Co. (1891), 27 Fla. 1, 9 So. 661, 680, 17 L.R.A. 33, 65), and has long been recognized and approved as the proper measure of damages with respect to the total loss of a ship

from a collision. Standard Oil Co. of New Jersey v. Southern Pacific Co. (1925), 268 U.S. 146, 45 S.Ct. 465, 69 L.Ed. 890; Carl Sawyer, Inc. v. Poor (5th Cir. 1950), 180 F.2d 962; United States v. Eastern S. S. Lines (1st Cir. 1948), 171 F.2d 589; Ozanic v. United States (2d Cir. 1948), 165 F.2d 738; Barton v. Borit (3d Cir. 1963), 316 F.2d 550. It is the measure of damages which has consistently been applied in cases involving the destruction of dolphins, pile clusters and similar wharf appendages, and navigational aids. General American Transp. Corp. v. The Patricia Chotin (E.D.La.1954), 120 F.Supp. 246; United States v. Pinckney (S.D.Ga. 1957), 150 F.Supp. 790; Patterson Terminals, Inc. v. S. S. Johannes Frans (E.D.Pa.1962), 209 F.Supp. 705; Atkins v. Alabama Drydock & Shipbuilding Co. (S.D.Ala.1960), 195 F.Supp. 944. Citing Shepard S. S. Co. v. United States (2d Cir. 1940), 111 F.2d 110, libelant argues that its injury ought to be viewed not as destruction of a dolphin but as damage inflicted on a drydock installation of which a dolphin was but a part, and that the amount agreed on by the parties for "repairs and renewals" should be regarded as the cost of repairing the damaged installation rather than the cost of replacing the destroyed dolphin. In this way libelant seeks to avoid the effect of depreciation in the calculation of its damages. The Court rejects libelant's reasoning in this respect, finding as it does that the dolphin was separate from the drydock and that it was capable of being used and was used independently of the drydock for two years, as a mooring for vessels. Compare Patterson Terminals, Inc. v. S.S. Johannes Frans (E.D.Pa.1962), 209 F.Supp. 705. Libelant further urges, as another reason for avoiding a deduction from the replacement cost on account of depreciation, that its 11-year-old dolphin was quite as serviceable as a new one when it was struck, that to extend the dolphin's usefulness indefinitely it would have been necessary only to install cathodic protection before the end of its twentieth year, and that the proper meas-

ure of its damage is the cost of replacing the dolphin less the relatively insignificant cost of providing cathodic protection for 11 years, which libelant regards as the value of the benefit it received when a new dolphin was installed. This theory is rejected as speculative, for the reasons set forth in the Court's findings as to damages (para. 18, supra). The allowance of damages predicated on the possibility that libelant might have installed a cathodic protection system before the dolphin had become completely deteriorated by corrosion would be wholly conjectural, uncertain and unwarranted.

5. Libelant is entitled to recover an amount equal to 45 per cent of the replacement cost of the dolphin, or $23,776.20, with interest at the legal rate from August 6, 1962, the date of the collision [Harris v. Sabine Transp. Co. (5th Cir. 1953), 202 F.2d 537], plus libelant's expenses in the amount of $534.67, incurred incident to the survey, with interest from August 10, 1962, the date when the survey was completed.

6. The United States has made no showing in law or in fact that, in the circumstances of this case, Rawls employed incompetent persons and unseaworthy or inadequate tugs in performing its repair contract or that it was otherwise responsible for the damage sustained by the United States. It is unnecessary to determine whether Rawls could be held responsible to the United States under Rawls' alleged obligation to perform the contract "in such a manner as not to visit liability to any person * * * upon its customer, the United States," since no liability will be imposed on the United States.

7. The United States is entitled to recover its damages in the amount of $150.00, plus interest at the legal rate from the date of the collision. The Government has not demonstrated that there exists any contractual or legal obligation on the part of any other party to this proceeding to pay the United States an attorneys' fee for the services of its attorneys in this proceeding, and

the Government's claim for attorneys' fees is denied.

8. Libelant's costs and those of the United States will be taxed against Florida Towing Corporation and the tugs' claimants jointly and severally and, as between those against whom costs are awarded, will be apportioned equally.

9. Counsel for libelant are instructed to prepare an appropriate decree in conformance with these findings and conclusions.